UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **LEGACY RECOVERY SERVICES, LLC;** **COLBURN "COLE" SULLIVAN,** **JOE MONTGOMERY, and** **JAMES "JIMMY" GAIENNIE, III** **Plaintiffs,** | **CIVIL ACTION NO.** |
| | |
| **VERSUS** | **JUDGE** |
| | |
| **CITY OF MONROE, LOUISIANA;** **FRIDAY ELLIS, individually and in his** **official capacity as Mayor of Monroe;** **MONROE CITY COUNCIL;** **DOUGLAS HARVEY; JUANITA WOODS;** **CARDAY MARSHALL, SR.;** **KEMA DAWSON; individually, and in** **official capacities as Monroe City Council** **members; CAROLUS RILEY, individually,** **and in her official capacity as Monroe City** **Clerk; and not yet known employee(s),** **policy maker(s), enforcement officer(s),** **agents(s) and supervisor(s).** **Defendants.** | **MAGISTRATE** **JURY TRIAL DEMANDED** |

## COMPLAINT

In this Complaint for Damages plaintiffs Legacy Recovery Services, LLC; Colburn "Cole" Sullivan, Joe Montgomery, and James "Jimmy" Gaiennie, III; respectfully represent:

### I.    PRELIMINARY STATEMENT

1.    Plaintiffs Cole Sullivan, Joe Montgomery and Jimmy Gaiennie organized Legacy Recovery Services, LLC d/b/a/ "Legacy House" for the sole purpose of establishing a commercially viable, low-level, residential treatment facility satisfying the criteria of Section 3.1

of the American Society of Addiction Medicine ("ASAM") and qualifying as an Institution for Mental Disease ("IMD") under federal law, allowing Medicaid-reliant men recovering from substance abuse to combine their collective buying power to obtain otherwise unavailable therapeutic benefits necessary to their recovery. Part and parcel of said benefits includes an opportunity for the intended residents of Legacy House to reside with other similarly situated recovering individuals in a safe, supportive, and clinically managed environment. This dynamic has the effect of ameliorating the debilitating qualities of the handicap shared by the intended residents of Legacy House.

2.      Plaintiffs allege the City of Monroe, Mayor Friday Ellis, City Clerk Carolus Riley, the Monroe City Council, and individual councilmembers Douglas Harvey, Juanita Woods, Carday Marshall, Sr.; and Kema Dawson engaged in a pattern of discrimination against plaintiffs and intended residents of Legacy House based on the latter's handicap as persons recovering from alcoholism, addiction, and substance abuse disorders.

3.      Plaintiffs particularly allege multiple, but separate and distinct, acts of discrimination practiced by defendants which have harmed, continue to harm, and will harm plaintiffs. Such discriminatory misconduct includes, but is not necessarily limited to: disparate treatment of plaintiffs, breaching a written purchase agreement in bad faith, pretending the refusal to sell real property to plaintiffs is due to some reason other than the handicap of the property's intended residents, violating or circumventing multiple federal and state laws, failing to comply with governing rules, arbitrarily imposing additional procedural requirements on plaintiffs, manipulating official minutes, denying plaintiffs due process and right to be heard, allowing prejudice to dictate the decisions of defendants, failing to recuse, illegally and erroneously refusing a request for reasonable accommodation, establishing policies which

discriminate against recovering individuals, failing to fully comply with public record law, and malfeasance, all set forth below in detail.

4.    Plaintiffs seek punitive and compensatory damages, including lost business opportunity and lost profits, costs, interest, and reasonable attorney fees from defendants who are liable to plaintiffs individually, jointly, severally and *in solido*.

## II.    PARTIES

5.    Cole Sullivan, Joe Montgomery, and Jimmy Gaiennie are each major domiciliaries of the State of Louisiana, aggrieved persons under federal law, and appear herein as plaintiffs along with Legacy Recovery Services, LLC d/b/a/ "Legacy House", a domestic entity with its principle place of business in Monroe, Louisiana organized by the individual plaintiffs to develop and manage a commercially viable, low-level, residential treatment facility satisfying the criteria of Section 3.1 of the American Society of Addiction Medicine ("ASAM") and qualifying an Institution for Mental Disease ("IMD") for the purposes of Medicaid reimbursement considerations.

6.    Made Defendants herein are:

(a) **City of Monroe**, Louisiana (hereafter "Monroe" or "the City"), a municipal corporation and political subdivision organized and operating under the laws of the State of Louisiana. The City receives federal assistance such as the Community Development Block Grant and Home Partnership Grant which are each funded by the United States Department of Housing and Urban Development.

(b) **Honorable Friday Ellis**, Mayor of Monroe, is the City's chief executive officer responsible for ensuring comprehensive compliance with all laws and rules; supervising the administration of all municipal departments; and enforcing the city charter, rules

governing the city council, fair administration of city policy, and obligations owed by the city to citizens appearing as parties to a contract with the City, subjects of a proposed ordinance, and/or applicants for reasonable accommodation under federal law.

(c) **Monroe City Council**, a governmental body elected by the citizens of Monroe who are each employees and/or agents of the City of Monroe charged with lawfully abiding by federal and state constitutions, federal and state laws, the city charter, and the rules, regulations, and city policies governing the city council, the administration of its business, and the contractual obligations established thereunder in good faith.

(d) **Douglas Harvey; Juanita Woods; Carday Marshall, Sr.;** and **Kema Dawson** are members of the Monroe City Council, who are each likewise charged with lawfully abiding by federal and state constitutions, federal and state laws, the city charter, and the rules, regulations, and city policies governing the city council, the administration of its business, and the contractual obligations established thereunder in good faith.

(e) **Carolus Riley**, Clerk for the City of Monroe, is employee and agent for the City of Monroe responsible for discharging administrative duties in good faith and who is also charged with lawfully abiding by federal and state constitutions, federal and state laws, the city charter, and the rules, regulations, and city policies governing the city council, the administration of its business, and the contractual obligations established thereunder in good faith. Ms. Riley is also the public records custodian for the City and responsible for lawfully complying with her corresponding obligations arising thereunder.

(f) **Not yet identified persons**, are officers or agents of the City of Monroe and/or the City Council who were policy makers, enforcement officers, and supervisors at or about the

time complained of, and who are liable to plaintiffs for any harm caused to plaintiffs by virtue of their individual, respective, mutual, and collective fault as discovery reveals.

### III.     JURISDICTION AND VENUE

7.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. § 3600 *et. seq.*; 42 U.S.C. §12101 *et. seq.*; 29 U.S.C. §791 *et. seq.*; 42 U.S.C. § 18116; and 42 U.S.C. § 1983. Plaintiff also invokes this Court's pendent jurisdiction to hear and adjudicate claims arising under the laws of the State of Louisiana. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 because the claims arose in this District and in Ouachita Parish, the parties are incorporated and reside in this District and Division, and a substantial part of the events giving rise to this action occurred in this District and Division.

8.     No pre-litigation requirements or administrative filings apply to Complainants' claims under the federal law applicable to this lawsuit, including 42 U.S.C. §§ 3600 *et. seq.* See *Bryant Woods Inn Inc., v. Howard Co., Md.,* (4th Cir. 08/25/97) 124 F.3d. 597. No pre-litigation requirements or administrative filings apply to Complainants' claims relating to deprivations of rights guarantee by the United States Constitution.

### IV.     FACTUAL BACKGROUND

9.     Untreated substance abuse is wreaking havoc on public health and safety in communities across the United States.

10.     From 1999 to 2015, the number of overdose deaths in the United States involving opioids has quadrupled.

11.     In Louisiana, the Office of Vital Records (OVR) has shown that deaths due to opioids in 2016 tripled since 2011. An OVR internal review estimates at least 54% of opioid deaths in Louisiana are not being reported as specific, opioid-related deaths.

12.     The 2019 National Survey of Drug Use and Health reported more than 2,000,000 Americans struggling with opioid-dependency alone. On December 17, 2020, the Center for Disease Control and Prevention ("CDC") issued a health alert advisory reporting on the nationwide increase in fatal drug overdoses secondary to the COVID-19 pandemic.

13.     On May 11, 2022, the CDC's National Center for Health Statistics released a report estimating 107,622 drug overdose deaths in the United States during 2021, an increase of nearly 15% from the 93,655 deaths estimated in 2020.

14.     Individuals suffering from alcoholism, addiction, and/or substance abuse are "handicapped", "qualified persons", and a protected class under applicable federal and state law.

15.     The residential environment of an individual recovering from substance abuse is essential to their recovery. Medical experts have repeatedly documented the tremendous therapeutic benefits of allowing individuals in recovery to reside with other recovering individuals. Generally, the longer an individual resides in a setting supporting their recovery, the better their chances of remaining abstinent. Community-based residential treatment is found to further enhance this dynamic.

16.     Analyses show consistent associations between low-income residents and reduced availability of recovery housing, clinical treatment, and recovery services.

17.     Accordingly, an increasing number of states have applied for, and received, Medicaid Section 1115 Demonstration Waivers for substance use disorders. The Centers for Medicare and Medicaid Services (CMS) created this opportunity under Section 1115(a) of the Social Security Act for states to draw dawn federal Medicaid payments for facilities with greater than sixteen (16) beds that provide residential treatment; payments which are otherwise prohibited by the Institution for Mental Disease Exclusion. Waiving the IMD Exclusion allows

states to offer short-term residential treatment, and the entire continuum of addiction treatment to their Medicaid members based on widely accepted standards for evidence-based care.

18.     A central goal of the Medicaid Section 115 Waiver is to allow states to receive matching federal Medicaid payments for services provided at short term residential treatment facilities. Otherwise, states are generally prohibited from using federal funds to pay for residential care in facilities with more than sixteen (16) beds.

19.     On November 7, 2017, Louisiana applied for a Section 1115 Waiver claiming it sufficiently demonstrated clinical and economic necessity for assistance with "the opioid epidemic public health emergency proclamation by the Acting Secretary of the United States Department of Health and Human Services."

20.     Louisiana's application references statistics intended to convey the facts that (a) Louisiana men are more at risk of an opioid related death than women and (b) Ouachita Parish is in the top 10 of confirmed parishes leading Louisiana in opioid death rates.

21.     Citing the "need" of its Medicaid enrollees for "vital" mental health and substance abuse treatment to "confront Louisiana's opioid epidemic", Louisiana's Application requests CMS authorize federal funding for Institutions for Mental Disease satisfying the criteria of ASAM that provide substance abuse treatment in the context of a residential setting.

22.     According to the Louisiana Department of Health, its decision to request a waiver was a "clinical strategy" because community-based, treatment of substance abuse in a residential setting is "most conducive" to treating the "needs" of Louisiana's Medicaid enrollees battling substance abuse disorders.

23.     CMS granted Louisiana's Section 1115 waiver request February 1, 2018.

24.     On December 2, 2022, CMS approved Louisiana's request to extend its Section 1115 Demonstration Waiver which now expires December 31, 2027.

25.     In "Section 8", CMS's geographical region in which this Court is situated, there are nine (9) clinically managed, high-intensity residential treatment facilities, totaling approximately 300 beds available to men recovering from substance abuse in this area. Medicaid typically provides for a thirty-eight (28) day stay at these types of facilities.

26.     To combat relapse and recidivism, CMS found it necessary to authorize federal reimbursement to low-level residential treatment facilities situated in Louisiana satisfying the criteria of Section 3.1 published by the American Society of Addiction Medicine. According to CMS, funding these facilities provides Medicaid-reliant individuals in recovery a way to procure necessary medical and therapeutic benefits, including the opportunity for those residents to reside together in extended recovery. Medicaid reimburses up to ninety (90) day stays at these types of facilities.

27.     At all times pertinent to this lawsuit, there was only one (1) operational 3.1 facility in the "Section 8" region available to Medicaid-reliant men suffering from substance abuse. The ratio between high-intensity treatment facilities and low-level residential treatment facilities accepting Medicaid in this region is 9:1. In other words, there is reduced availability of recovery housing, clinical treatment, and recovery services available to Medicaid-reliant men in this geographical region and a corresponding need for additional 3.1 facilities.

### LEGACY HOUSE

28.     On January 19, 2022, Cole Sullivan, Joe Montgomery, and Jimmy Gaiennie organized and registered Legacy Recovery Services, LLC d/b/a ("Legacy House") in a venture to own and operate a commercially viable, low-level, clinically managed residential treatment

facility, an Institution for Mental Disease that satisfies the criteria of ASAM Section 3.1. Plaintiffs' business model intends to provide services consistent with the objectives of CMS in combating Louisiana's substance abuse epidemic.

29.     Legacy House proposes to provide Medicaid-reliant individuals who have completed intensive inpatient treatment for substance abuse a way to reside together in extended recovery and procure medical and therapeutic benefits necessary to their recovery by combining their individual Medicaid buying power. Such resources are simply unavailable to the intended residents of Legacy House on an individual basis due to cost.

30.     The therapeutic value of allowing recovering alcoholics to live together is extraordinarily critical to their recovery. By living with other persons in recovery, the residents should never have to face an alcoholic or addict's deadliest enemy: loneliness and isolation.

31.     There is sufficient evidence to show that this type of living arrangement has an ameliorative effect on a resident's disability and enables those residents to turn their life around.

32.     In addition to facilitating the ideal living arrangement sanctioned by CMS, plaintiffs' venture further proposes to provide individualized treatment to its residents by a licensed therapist, peer support from certified recovery coaches, life skills training, and social skill development to help clients reintegrate into society and plan for their future.

33.     Legacy House requires its residents to always remain sober, attend meetings of Alcoholics Anonymous or Narcotics Anonymous, seek gainful employment, obey all state and federal laws, and respect the specific rules and regulations of the facility which are meant to foster a supportive, family-like environment among its residents.

34.     Economically, Legacy House would function by combining each resident's individual Medicaid benefits into a collective buying power sufficient to operate a cost-sharing

facility that allows recovering individuals to live with one another in clinically managed, extended recovery. Acting alone, this opportunity would simply be unavailable to those residents. Indeed, without such arrangement, these individuals would be denied their right to dwell together in a proven therapeutic environment as unrelated individuals are often not able to live safely and independently without organized, and sometimes commercial arrangements.

35.     The Section 1115 Waiver mentioned above is intended to fund the precise type of living arrangement supported by the facility plaintiffs intended to develop and operate for men in Section 8, Ouachita Parish included.

36.     After organizing their business entity, plaintiffs began researching available properties and analyzing the economic viability of operating a Legacy House on those properties in accordance with its model, mission, and goals, which compliment those of CMS. Importantly, new construction was cost prohibitive for Legacy's model.

37.     Eventually, plaintiffs' realtor advised plaintiffs the City of Monroe had asked her to find a buyer for an available, vacant property she believed was "perfect" for plaintiffs' needs.

38.     Prior to offering the property for sale, the City had determined such property was no longer needed for public use.

### THE PROPERTY

39.     The property in question is a two (2) story, 23,090 square-foot building containing fifty-six (56) bedrooms or equivalent thereof with ample parking situated on two (2) lots located at 1400 and 1401 Stubbs Avenue in Monroe (hereinafter simply "the property"). The property, and properties adjacent thereto, are zoned as B-4 Heavy Commercial District. In other words, the property is correctly zoned for the intended use of Legacy House. In a one block radius of the

property, there are at least seven (7) psychiatrists, psychologists, counselors, therapists, and clinics providing treatment for mental illness, alcoholism, drug addiction, and substance abuse.

40.     The only outlier in the context of the city's zoning scheme is a church adjacent to the subject property owned and operated by Pastors Daniel and Carolyn Hunt, close friends with the Chairman of the Monroe City Council, Kema Dawson, and councilmember Juanita Woods.

### VIABILITY OF LEGACY HOUSE AT THE PROPERTY

41.     Legacy's business model is based on cash flow derived from a Medicaid reimbursement rate on per day, per capita, basis. To service capital debt, operating costs, and prospective return on investment, it became clear Legacy House would need to maintain a minimum of forty-eight (48) residents at that property to successfully and safely establish and maintain a commercially viable business capable of effectively and safely delivering medical and therapeutic benefits to Medicaid-reliant men in recovery.

42.     The property in question has ample capacity for fifty-six (56) bedrooms, sufficient parking, and enough additional space to simultaneously facilitate the proposed services and in-house administrative offices. Moreover, the property is situated in a geographical region in which there is a network gap in Medicaid coverage and reduced availability of services plaintiffs intended to provide.

43.     Accordingly, to seize the opportunity to establish a profitable business while fulfilling a dire need in Ouachita Parish, Cole Sullivan offered to purchase the property from the City of Monroe for $50,000.00 more than the highest appraised value of the property and $150,000.00 more than the lowest appraised value of the property.

44.     At all times pertinent, plaintiffs were fully financially capable of establishing and operating their proposed business venture in accordance with the offer to purchase.

### THE PURCHASE AGREEMENT

45.    On March 3, 2022, the Director of Administration of the City of Monroe accepted Mr. Sullivan's offer to purchase. A written agreement to sell the vacant property at 1400 and 1401 Stubbs to Cole Sullivan (o/b/o plaintiffs) for $1,050,000.00 was executed.

46.    The written purchase agreement was drafted solely by the City of Monroe is the best evidence of the agreement at issue.

47.    The original "Contingency" Section of the purchase agreement, Section 21, states "***the offer to purchase*** is contingent upon" … the Monroe City Council's approval of the sale. (Emphasis supplied)

48.    Plaintiffs specifically allege certain provisions of the purchase agreement are vague and ambiguous, including the original "Contingency" Section, which must be construed against the City of Monroe as a matter of law.

49.    On April 8, 2022, the city amended Section 21 of the purchase agreement to state, "If any of the following conditions are in conflict with the original purchase agreement, the following conditions of the sale provisions will control." Although the City added contingencies *in favor of plaintiff/buyers*, the City did not amend the provision stating the contingency of city council approval applied to "the offer to purchase".

50.    In the purchase agreement, the City expressly represented and warranted to the buyer that the City had the authority to enter the purchase agreement and was not aware of any proceeding, legal action, lawsuit, claim, administrative proceeding, or any facts relating to any claim or administrative proceeding, that would affect the sale, use, operation, or occupancy of the property. Upon signing the agreement, the City disclaimed knowledge of any proceeding, legal action, lawsuit, claim, administrative proceeding, or any facts relating to any claim or

administrative proceeding, that would affect the sale or use of the property. The agreement specifically states those representations and warranties will remain true and correct through the Closing date, shall survive the Closing, and the City will immediately inform the buyer if any of the foregoing representations and warranties become untrue or misleading.

51.    Over the course of six (6) months and at considerable out-of-pocket expense, the buyers exchanged communications with city officials, submitted multiple documents to various city departments on behalf of Legacy House, and met with city officials on multiple occasions in attempting to perform the purchase agreement in good faith and consummate the sale.

52.    At all times pertinent, all parties to this lawsuit understood the buyers proposed to own and operate a residential substance abuse treatment facility on the property subject of the purchase agreement. Each defendant knew plaintiffs had entered into a contract to establish and operate a residential treatment facility on the property for commercial gain.

53.    By early September, all parties agreed the city intended to sell, and the buyers intended to buy, the property at 1400 and 1401 Stubbs for $1,050,000.00, which was $150,000.00 more than the lowest appraised value of the property and $50,000.00 more than the highest appraised value of the property. Indeed, appropriate city officials confirmed infrastructure concerns would not prevent the sale of the property to plaintiffs.

54.    La. R.S. 33:4712 provides that an ordinance must be introduced before the property can be sold and requires notice of the proposed ordinance to be circulated by newspaper or by posting the notice in three conspicuous places in the municipality. Importantly, Louisiana law requires any opposition to a proposed ordinance to be made in writing and filed with the city clerk within fifteen (15) days of the first publication of the proposed ordinance.

55.     On September 8, 2022, the City Council of Monroe posted "NOTICE" of its proposed ordinance to sell the property at 1400 and 1401 Stubbs to Cole Sullivan. Said ordinance was scheduled to be introduced at the city council meeting September 13, 2022.

**FIRST CITY COUNCIL MEETING – SEPTEMBER 13, 2022**

56.     During its meeting September 13, 2022, the city council moved to introduce the ordinance to sell the property to Cole Sullivan. The motion was seconded.

57.     Although the motion had been seconded, the Chairperson for the City Council of Monroe, Kema Dawson, did not put the question to vote.

58.     Instead, the opportunity for public comment relative to the motion to introduce the proposed ordinance saw oral opposition to the contracted sale of surplus City property based solely on discrimination against the intended handicapped residents of Legacy House.

59.     Allowing debate of the merits of a proposed ordinance, which had not been introduced, runs contrary to the rules governing the city council, its meetings, the administration of its business, and La. R.S. 33:4712, which requires any opposition to a proposed ordinance to be in writing.

60.     More particularly, Pastors Daniel and Carolyn Hunt, who own and operate a church adjacent to the property, voiced oral opposition to the ordinance to sell the property to Mr. Sullivan based on unfounded, unsubstantiated stigma the Hunts associate with the intended residents of Legacy House as individuals recovering from substance abuse.

61.     First, the Hunts complained they "did not know" Cole Sullivan. This statement sparked a series of questions from city council members, including whether the recovery residents would be "free" to leave the facility, whether the recovery residents were "screened for mental illness" before allowing quarter, whether the intended handicapped residents were

"felons", "killers", or "rapists", and whether plaintiffs would "send them back on the streets" at the conclusion of their stay.

62.    Questions from the council provoked public comment unfairly equating plaintiffs' proposed facility with other facilities managed by entirely different individuals and entities. According to one speaker the City needs to "control" handicapped residents, because establishing a clinically managed residential treatment facility available to Medicaid recipients is "the worst thing that could happen to our community." Pastor Carolyn Hunt explained she "knows the community" to include, "daycares…salons…pediatric dentists", and plaintiffs' venture simply "does not fit in this area".

63.    Councilmember Gretchen Ezerneck responded that the property is correctly zoned for its intended use, and in truth, there are at least seven (7) offices of psychiatrists, therapists, counselors, and groups treating substance abuse disorders within a one-block radius of the Hunts' church and subject property.

64.    The only meaningful difference between the businesses currently operating within a one-block radius of the property and the facility proposed by plaintiffs is that individuals in recovery would temporarily reside at plaintiffs' facility during their treatment.

65.    Monroe Mayor Friday Ellis, individual members of the city council, and attending city officials each and all breached their respective and mutual official duties to enforce rights and privileges guaranteed by Constitution of the United States, Louisiana State Constitution, multiple state and federal laws, the Monroe City Charter, the purchase agreement, and the rules regulating, the city council, city council meetings, the administration of its business.

66.    Such duties breached by defendants include, but are not limited to, individual and collective failures to (a) enforce procedural and administrative rules and requirements relative to

introducing proposed ordinances to sell real property; (b) abide by state and federal laws; (c) observe the representations and warranties set forth in the purchase agreement; (d) properly supervise, administer, and instruct the council members their actions cannot be influenced by bias against persons with disabilities; (e) resist public pressure to discriminate against the intended residents of Legacy House based on their disability; and (f) refrain from treating plaintiffs and the intended residents of their facility differently than any other party to a purchase agreement or subject of a proposed ordinance.

67.    After admitting she "know[s] the church", councilmember Juanita Woods suggested to "pass over" the vote on introducing the ordinance until October 25, after a "community meeting" could be held.

68.    Councilmember Douglas Harvey pointed out introduction of the ordinance should take place *before* requesting community feedback and that "short of anything egregious" he [defendant Harvey] "always" introduces a proposed ordinance so the community can learn more about the ordinance proposed by the city council.

69.    The council voted to defer voting on introduction of the proposed ordinance to sell the property until October 25, 2022.

70.    In doing so, the mayor, members of the city council, and city officials ignored substantive laws as well as procedural and administrative rules. Neither the mayor, any member of the city council nor any city official objected to any violation of same or cautioned against allowing the actions of the city to be influenced by out of order comments, insinuation, and innuendo expressing bias against persons with disabilities.

71.    Neither the mayor, any member of the city council nor any city official cautioned against bowing to discriminatory public opinion.

72.    The mayor, councilmembers, and all city officials present at the meeting acted alone, in concert, and under color of state law to wrongfully place additional procedural requirements on plaintiffs in connection with the sale of surplus municipal property.

73.    In short, plaintiffs allege such wrongful conduct was part and parcel of a scheme to intentionally deny the handicapped residents of Legacy House the benefits authorized by CMS and deny plaintiffs' corresponding business opportunity and lost profits.

### THE COMMUNITY MEETING

74.    On September 26, 2022, the "community meeting" suggested by councilmember Woods took place at the Hunts' church.  The Hunts distributed pre-printed literature opposing the sale of the property on the basis that individuals in recovery intended to dwell there. The ensuing meeting served as a platform for several individuals to vocalize their own brand of unsupported, unsubstantiated stigma and innuendo respectively attributed to individuals in active addiction. The substance of the opposition amounted to: Because "alcoholics/addicts" would dwell at plaintiffs' facility, nondescript "problems" would erupt, it would "only be a matter of time" before "something" would happen to unidentified "women" and therefore the value of each opponent's property would surely decrease.

75.    Without exception, each opponent admitted the "problems" with which they were concerned were already present in their community.

76.    Pastor Daniel Hunt equated the proposed dwelling for handicapped residents to a "toilet" in his "kitchen".

## CITY CONFIRMS DEFERRING VOTE WITHOUT WRITTEN OPPOSITION

77.     Also on September 26, plaintiffs issued a public records request to the City for all written oppositions to the proposed ordinance to sell the property which had been filed with the municipal clerk in accordance with state law.

78.     On September 28, the City confirmed the vote on introducing the ordinance had been "deferred" to October 25 and no written opposition had been filed with the City.

79.     Under applicable law, the city charter, and rules governing ordinances, city officials, the city council, city council meetings, and the administration of its business, including Robert's Rules of Order, the city council's vote on introducing the ordinance October 25, 2022, and public debate relating thereto, were required, mandatory, and non-discretionary where the motion to introduce the ordinance was made, seconded, the second was never withdrawn, and the vote on the proposed ordinance was "deferred" to a definite date.

## PLAINTIFFS' LETTER TO THE CITY

80.     On October 21, 2022, plaintiffs hand delivered a letter to the City of Monroe which reminded the City that La. R.S. 33:4712 requires any opposition to a proposed ordinance to be filed with the municipal clerk, no opposition had been filed, and the only oral opposition to the proposed ordinance amounted to illegal discrimination against the intended residents of the treatment facility based on their handicap.

81.     Plaintiffs' letter made clear any pretext for refusing to sell the property under the present circumstances amounted to a violation of the federal Fair Housing Act, the Americans with Disabilities Act, the Rehabilitation Act, and official city policy. The letter demanded the City honor its obligations under the purchase agreement and "immediately" inform the buyer if the City became aware of any fact, including any fact related to any administrative proceeding,

that would threaten the sale, use, ownership, or occupancy of the property. Plaintiffs' demand was met with silence and inaction on the part of defendants.

82.     Plaintiffs' letter further requested reasonable accommodation under the Fair Housing Act and concluded by requesting the City to advise whether addition information was necessary prior to the City acting on applicants' request for reasonable accommodation.[1] Applicants attached several records to their letter, including without limitation, the literature distributed by the Hunts at the "community meeting", an audio recording of the "community meeting", an affidavit from a licensed addictionologist, articles from various medical journals, an affidavit from Cole Sullivan, city zoning records, the purchase agreement, and a copy of the City's anti-discrimination policy.

## THE CITY'S RESPONSE TO PLAINTIFFS' LETTER

83.     After plaintiffs' letter was submitted to the City, Mayor Ellis and several members of the city council met behind closed doors, in secret, to determine a binding course of action regarding the purchase agreement, the reasonable accommodation request, and the proposed ordinance, which was "not going away." One councilmember conducted telephone polling, prior to any public debate.

84.     The agenda for the city council meeting for October 25, 2022, does not identify any executive session that took place concerning the proposed ordinance to sell the property to plaintiffs, the purchase agreement, the intended residents of Legacy House, plaintiffs' letter, or request for reasonable accommodation.

---

[1] The City of Monroe has delineated its own Application and Procedure for requesting reasonable accommodation under federal law. According to the City of Monroe, a request for reasonable accommodation applies only to zoning districts that allow single family homes and then only for "group homes" defined by the City as "a single-family residential structure...***not including alcohol and drug abuse clientele***..." The City does not provide a procedure for appealing the denial of a request for reasonable accommodation outside of this context. Accordingly, plaintiffs submitted their request for reasonable accommodation directly to the office of the City Attorney.

85.     Obviously, named defendants secretly meeting behind closed doors to determine the City's course of action directed at a single developer based on illegal discrimination and in violation of Louisiana's Sunshine Laws fails to qualify as a legitimate legislative activity.

86.     On October 25, approximately two (2) hours before the city council would resume its "deferred" vote to introduce the ordinance to sell the property, Kema Dawson, Chairperson of the Monroe City Council, sent a text message to Pastor Carolyn Hunt alerting her that Dawson's calls to Hunt were "going to [her] voicemail." Carolyn Hunt's name is stored in Dawson's cell phone as "First Lady Hunt."

### THE SECOND CITY COUNCIL MEETING – OCTOBER 25, 2022

87.     At the second council meeting on October 25, 2022, approximately twenty (20) individuals waited in the audience to speak in favor of both introducing the ordinance to sell the property and plaintiffs' application for reasonable accommodation under the Fair Housing Act. Among those waiting to be heard were two (2) licensed physician addictionologists; members of Legacy Recovery Services, LLC; and approximately fifteen (15) witnesses who sought to provide testimony to the city council. Pastors Daniel and Carolyn Hunt were also present.

88.     The proposed ordinance to sell the property was the last item on the agenda. The mayor, city council, and city officials circumvented the rights and privileges guaranteed by the United States Constitution, the Louisiana Constitution, federal laws, state laws, the city charter, the purchase agreement, and the rules governing the city council and administration of its business, including Robert's Rules of Order, by pretending the motion to introduce the ordinance had not already been seconded September 13, and the vote on introducing the ordinance had been deferred to October 25 pending public debate.

89.     No debate or comment was allowed prior to action on the ordinance.

90.     Chairperson Dawson refused to put the vote to a question. Defendants remained silent and inactive in refusing to enforce the applicable constitutional provisions, laws, statutes, rules, the city charter, the purchase agreement, and resolutions, notwithstanding their mutual and respective official duties to the contrary and requirements of due process and equal protection.

91.     Councilmember Gretchen Ezernack reminded all city officials La. R.S. 33:4712 requires opposition to an ordinance to be in writing and attempted to open discussion by re-urging introduction of the ordinance.

92.     The mayor, all other council members, and the city clerk sat in silence until Chairperson Dawson quietly declared the (already seconded) motion, "died" for lack of a second.

93.     This marked the consummation of the City's decision-making process from which legal consequences flow.

94.     Although present at the meeting, neither plaintiffs, nor the Hunts, had heard Chairperson Dawson's declaration or understood what action the City had taken until after the city council meeting had concluded when Dawson explained to concerned citizens wanting to be heard that there would be no debate because the ordinance was already "dead".

95.     Dawson told the Hunts on the record she would talk to them later off the record.

96.     In fielding off the record inquires made immediately after Dawson's comments, Dawson told the Hunts she would "call [them] later" and referred plaintiffs to "legal" who immediately referred plaintiffs back to Dawson.

97.     The "deferred" vote to sell real property *no longer needed for public use* for $150,000.00 more than the lowest appraised value of that property and $50,000.00 *more than the highest appraised value of the property, which had been fixed by the city council to take place October 25, did not take place. No opportunity for public comment was allowed. No*

*written opposition to the ordinance was ever filed and the only oral opposition amounted to*

*illegal discrimination against the intended residents of Legacy House based on their handicap.*

98.    Not a single councilmember, the mayor, any city official, or any representative of the city asked any question relating to plaintiffs' reasonable accommodation request, allowed plaintiffs to present evidence concerning same, or indicated plaintiffs' request for accommodation was insufficient for any reason.

99.    Knowing its actions were illegal, defendants simply bowed to community pressure voiced orally from affluent constituents behind closed doors to deny the sale of the property to plaintiffs based on the handicap of the intended residents of that property.

100.    The defendants illegally refused to introduce the ordinance, refused to allow debate thereon, refused to allow plaintiffs to be heard, and refused to honor the "deferred" vote on the ordinance because such would reveal discriminatory animus against the protected intended residents of Legacy House was a significant factor in the decision making of the city council and those to whom the council were knowingly responsive: including "First Lady Hunt" and her husband who believes allowing a residential facility intended to treat individuals recovering from substance abuse is the equivalent of a "toilet in [his] kitchen."

101.    Plaintiffs allege defendants' misconduct is undeniably administrative in nature.

102.    Such actions, inactions, silence, and omissions were undertaken in knowing violation of the text and spirit of the United States Constitution, the Louisiana Constitution, multiple federal and state laws, the city charter, and the rules and regulations governing the city council, the administration of its business, the mayor, the city clerk, the city council members and their individual respective, mutual, and collective official duties as public officials.

103.    Defendants acting alone and in concert effectively denied plaintiffs the right to review and respond to a written opposition to the proposed ordinance, to be heard and submit evidence in favor of reasonable accommodation, to submit evidence and argument in favor of introducing the ordinance, to learn of the telephone polling prior to debate, to learn the City had knowledge of administrative facts that threatening the sale of the property which the City refused to disclose per the terms of the purchase agreement, and that council members and the mayor had met in secret behind closed doors to determine a course of action which defendants knew would harm plaintiffs and the residents of Legacy House.

104.    Plaintiffs further allege they were treated differently than any other signatory of a written purchase agreement with the City of Monroe, and/or subject of a proposed ordinance to sell surplus municipal property no longer needed for public use.

105.    Upon information and belief, other than in the instant matter, neither the City of Monroe nor its Director of Administration has ever executed a purchase agreement to sell real property correctly zoned for the buyer's intended use for a price substantially more than its appraised value then the Monroe City Council failed to introduce the proposed ordinance to sell the property per the terms of the purchase agreement.

106.    Plaintiffs further allege such disparate or selective enforcement also includes forcing plaintiffs to comply with additional procedural requirements, terms, and conditions of the sale, such as the "community meeting" fabricated by the city council to avoid voting on the already seconded motion to introduce the ordinance.

107.    Plaintiffs aver the City cannot cite a single instance, other than in the instant matter, where an ordinance was proposed by the City, the motion to introduce the ordinance was seconded, the second was never withdrawn, and the City declined to vote on the ordinance.

108.     Plaintiffs allege such disparate treatment and/or or selective enforcement was motivated by prejudice against the handicap of the intended residents of the property. Indeed, no rational basis exists for defendants' actions described above.

### DENIAL OF REASONABLE ACCOMMODATION WITHOUT HEARING

109.     On October 28, 2022, three (3) days after the second council meeting, the City denied plaintiffs' reasonable accommodation request by letter.

110.     The City complained plaintiffs did not "specifically" know on October 21 that the vote the City deferred to October 25 would not take place. Defendants somehow contend plaintiffs should have known on October 21 of the City's October 25 "practice" of pretending the motion to introduce had not already been seconded.

111.     Prior to denying plaintiffs' request for reasonable accommodation, plaintiffs were not afforded an opportunity to be heard, let alone have notice or opportunity to respond to any questions, concerns, or objections to plaintiffs' request for reasonable accommodation.

### PUBLIC RECORDS REQUEST

112.     On October 31, 2022, plaintiffs propounded a public records request on the City for information pertinent to their venture, including communications between its council members, the video recordings of both city council meetings, the official minutes of the city council meetings, and the rules and regulations governing the city council and its meetings.

113.     On January 3, 2023, the Clerk and record custodian for the City produced partially redacted email communications between council members. The clerk declined to cite any public record exception for the redaction or explain why some of the communication was a responsive public record and other parts of the same communication were not public record.

114.    The clerk further produced a resolution which requires her to identify the full name of council members who second any motion.

115.    The clerk also produced official meeting minutes in which she omits the fact that the motion to introduce the ordinance to sell the property to Cole Sullivan was seconded during the September 13, 2022, city council meeting, and much less the names of the council member seconding that motion.

116.    Plaintiffs reserve the right to amend their Complaint as more information becomes available in discovery.

## V.      LIABILITY FOR DAMAGES

117.    Through the actions, inactions, silence, and omissions described herein, defendants individually, respectively, collectively, and mutually acted negligently, intentionally, maliciously, irrationally, arbitrarily, capriciously, outrageously, recklessly, without regard to plaintiffs' rights, and in knowing violation of clearly established rights guaranteed by the Constitution of the United States, the Louisiana Constitution, federal and state laws, the city charter and the rules, regulations and resolutions governing city officials, the city council, the administration of its business, and the purchase agreement.

118.    Plaintiffs specifically allege defendants' mutual and respective wrongful actions, inactions, silence, and omissions complained of herein are undeniably administrative in nature. Under the circumstances, defendants had no discretion whether to vote on the motion to introduce the ordinance and/or allow debate of that motion where (a) the motion had been seconded, (b) the second was never withdrawn, and (c) the vote was deferred to a specific date.

119.    Further, defendants' decisions to meet in secret and behind closed doors to determine a course of action based on illegal discrimination in specific regard to plaintiffs and in

violation of Louisiana's Sunshine Laws, fails to qualify as a legitimate, quintessentially legislative activity. Defendants' misconduct specifically targeted plaintiffs rather than the community generally. The facts considered by defendants in its decision making related to plaintiffs specifically, instead of general policy implications. The actions and inactions at issue intentionally single out plaintiffs to worsen their legal plight by treating plaintiffs differently from other similarly situated individuals purchasing property from the City.

120.    As a proximate and direct result of the misconduct on the part of defendants, individually and collectively, plaintiffs have suffered, continue to suffer, and will suffer general and special compensatory damages, economic loss, loss of business opportunity, lost profits, injury, inconvenience, damage to reputation, embarrassment, humiliation, and professional expenses as proven in respective amounts to the satisfaction of the trier of fact.

121.    The misconduct complained of herein has ruined, if not frustrated, the mission of Legacy House and caused it to divert significant resources to counteract defendants' misconduct.

122.    The misconduct complained of herein has further deprived plaintiffs of their right to purchase property and operate commercially-viable residential treatment facility in accordance with the rights, privileges, benefits and principles afforded by clearly established law including the Constitution of the United States, the Louisiana Constitution, multiple federal and state laws, the Monroe City Charter, rules governing city officials, the city council, administration of its business, the signed purchase agreement, and in accordance with the objectives of CMS.

123.    Accordingly, the intended residents of Legacy House were denied the benefits available under Medicaid and/or those made available under Louisiana's Section 1115 waiver.

124.    Moreover, the irrational actions of defendants, who are recipients of federal assistance, have also frustrated plaintiffs' rights to be treated by the City of Monroe as any other

similarly situated citizen or entity including signatories to a purchase agreement, subjects of a proposed ordinance, and/or applicants for reasonable accommodation.

125.    For example, other than in this matter, neither the City of Monroe, nor its Director of Administration, has ever executed a purchase agreement to sell real property correctly zoned for the buyer's intended use for substantially more than the property's appraised value, then the Monroe City Council fail to introduce the proposed ordinance to sell the property.

126.    The City also imposed additional procedural requirements, terms, and conditions of the sale on plaintiffs such as the "community meeting" fabricated by the city council to avoid voting on the already seconded motion to introduce the ordinance.

127.    Further, other than in this case the City has never proposed an ordinance, seconded the motion to introduce the ordinance, then declined to vote on the ordinance it had proposed to introduce.

128.    Each individual named defendant qualifies as a city official with the authority to address discrimination and institute appropriate corrective measures, and who instead, intentionally discriminated against plaintiffs and the intended residents of Legacy House and further practiced deliberate indifference to actual knowledge of such discrimination.

129.    Plaintiffs each and all are justly entitled to all damages proven to the satisfaction of the trier of fact, and as such appropriately correspond with the Counts below which collectively include, general and economic compensatory damages including lost profits, lost business opportunity, punitive damages, costs, legal interest, and reasonable attorney fees.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE
**Violation of 42 U.S.C § 3604**
**Federal Fair Housing Act**
**AGAINST ALL DEFENDANTS**

130.    Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

131.    The Fair Housing Act provides that it is illegal to discriminate in the sale or otherwise make unavailable or deny a dwelling to any buyer because of a handicap of a person intending to reside in that dwelling after it is sold. The Fair Housing Act also provides it is illegal to discriminate against any person in the terms, conditions, or privileges of a sale of dwelling or in the provision of services or facilities in connection with such dwelling because of a handicap of a person intending to reside there after it is sold. Lastly, the Fair Housing Act makes it unlawful for a municipality to refuse to make reasonable accommodations in rules, policies, practices, or services when accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

132.    The proposed Legacy House venture property and improvements at 1400 and 1401 Stubbs qualifies as a "dwelling" under the Fair Housing Act.

133.    The intended residents of Legacy House are "handicapped" for the purposes of the Fair Housing Act as being diagnosed with alcoholism, addiction and/or substance abuse coupled with treatment and nonuse.

134.    Defendants, through their actions and inactions, are liable for the violation of plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3601 *et. seq*.

135.    Plaintiffs specifically reiterate that such discriminatory misconduct includes, but is not necessarily limited to: disparate treatment of plaintiffs, breaching the purchase agreement with plaintiffs in bad faith, pretending the refusal to sell the property to plaintiffs is due to some reason other than the handicap of the intended residents, violating or circumventing multiple federal and state laws, failing to comply with governing rules, arbitrarily imposing additional procedural requirements on plaintiffs, manipulating official minutes, denying plaintiffs due process and right to be heard, allowing prejudice to dictate the outcome of city council actions and inactions, failing to recuse, illegally and erroneously refusing a request for reasonable accommodation, establishing policies which discriminate against recovering individuals, failing to fully comply with public record law, and malfeasance.

136.    Defendants are further violating plaintiffs' rights under the Fair Housing Act by refusing to sell the property and imposing additional procedures, terms, and conditions on the sale because of the handicap of its intended residents, and by interfering with the intended residents' right to live in a dwelling of their choice.

137.    Defendants are also each individually liable to plaintiffs under the federal Fair Housing Act because they knowingly bowed to the discriminatory animus of the community against protected individuals. Indeed, discriminatory animus against the protected group was a significant factor in the actions taken by the municipal decision-makers themselves and by those to whom the decision-makers were knowingly responsive.

138.    Plaintiffs further specifically allege the City, the mayor, the municipal clerk, the city council, and its individual defendant-constituents acted willfully and with gross disregard for plaintiffs' rights. Defendants' actions and inactions complained of herein are undeniably administrative in nature. Defendants' decisions, actions, silence, omissions, and calculated

inaction specifically impacted plaintiffs rather than the community. The facts considered by the individual defendants in its decision making related to plaintiffs specifically instead of general policy implications. The actions at issue intentionally single out plaintiffs and affect plaintiffs differently from others who are similarly situated.

WHEREFORE Plaintiffs demand and solemnly pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* and request the Court grant the following relief:

    i.    Declaratory relief stating defendants' mutual and respective actions and inactions constitute violations of the federal Fair Housing Act;

    ii.    Compensatory damages, including lost profits and/or lost business opportunity;

    iii.    Punitive damages;

    iv.    Reasonable attorney fees; and

    v.    Such other and further relief as the Court deems necessary and appropriate.

**COUNT TWO**
**Violation of 42 U.S.C. §12101 *et. seq.***
**American with Disability Act of 1990**
**AGAINST ALL DEFENDANTS**

139.    Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

140.    The Americans with Disabilities Act (the "ADA") provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the service, program, or activity of a public entity, or be subjected to discrimination by any such entity.

141.    Section 12132 of the ADA constitutes a general prohibition against discrimination on the basis of disability by public entities.

142.    Additionally, the ADA makes it unlawful for a public entity in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities from, denying such disabled persons the benefits of such facility, or otherwise subjecting them to discrimination. 28 C.F.R. 35.130(b)(4).

143.    To be admitted to plaintiffs' facility, the resident-patients must be diagnosed as suffering from substance abuse and agree to remain sober and participate in substance abuse treatment. Consequently, the intended residents of Legacy House, as individuals with disabilities that substantially impair one or more major life activities, are "qualified persons" with disabilities within the meaning of the ADA. 42 U.S.C. 1202(2) and 28 C.F.R. 35.104.

144.    As entities, agents, and instrumentalities of municipal government named defendants qualify as public entities within the meaning of the ADA, 42 U.S.C. 12131.

145.    The defendants have violated and continue to violate the ADA by and through disparate treatment of plaintiffs, breaching the purchase agreement with plaintiffs in bad faith, violating or circumventing multiple federal and state laws, pretending the refusal to sell the subject property to plaintiffs is due to some reason other than the handicap of the intended residents, failing to comply with governing rules, arbitrarily imposing additional procedural requirements on plaintiffs, manipulating official minutes, denying plaintiffs due process and right to be heard, allowing prejudice to dictate the outcome of city council actions and inactions, failing to recuse, illegally and erroneously refusing a request for reasonable accommodation, establishing policies which discriminate against recovering individuals, failing to fully comply with public record law, and malfeasance.

146.    Defendants have further violated the ADA by (a) denying the intended residents of Legacy House, individuals recovering from alcohol and substance abuse, the opportunity to participate in or benefit from the supportive residential treatment program offered by Legacy House and paid for by Medicaid through the Section 1115 Waiver; (b) by subjecting the intended residents of plaintiffs' facility to discrimination on the basis of their handicap in the illegal administration of municipal government; (c) by denying the intended residents of Legacy House an opportunity to participate in the most integrated and cost efficient setting appropriate to their needs; (d) denying the intended residents of Legacy House an equal opportunity to benefit from services and programs equal to those of people without disabilities; and (e) by utilizing municipal government to provide disparate treatment to groups of unrelated disabled persons who are recovering alcoholics and drug addicts.

WEHEREFORE Plaintiffs pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* and request the Court grant the following relief:

i.      Declaratory relief stating defendants' mutual and respective actions and inactions constitute violations of the Americans with Disabilities Act;

ii.     Compensatory damages, including lost profits and/or lost business opportunity;

iii.    Reasonable attorney fees; and

iv.     Such other and further relief as the Court deems necessary and appropriate.

**COUNT THREE**
**Violation of 29 U.S.C. § 791 *et. seq.***
**Rehabilitation Act of 1973**
**AGAINST ALL DEFENDANTS**

147.    Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

148.    The Rehabilitation Act, 29 U.S.C. 791, *et. seq.* provides that no qualified individual with a disability shall, solely by reason of her or his disability, be excluded from participation in or be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

149.    The City of Monroe receives federal assistance such as the Community Development Block Grant and Home Partnership Grant which are each funded by the United States Department of Housing and Urban Development. The Rehabilitation Act defines "programs or activity" as "all of the operations" of specific entities, including "a department, agency, special purpose district, or other instrumentality of a state or of a local government." 29 U.S.C. § 794(b)(1)(A).

150.    The City of Monroe, the mayor of Monroe, its City Council, its individual defendant constituents, the municipal clerk, and city officials are agents and instrumentalities of municipal government and thus covered under the Rehabilitation Act. Defendants are qualifying public entities within the meaning of the Rehabilitation Act.

151.    To be admitted to plaintiffs' facility, the patient must be diagnosed as suffering from alcoholism, addiction, or substance abuse and agree to remain sober and participate in treatment. Consequently, the intended residents of Legacy House are qualified persons with disabilities within the meaning of the Americans with Disability Act and Rehabilitation Act, which prohibits disability-based discrimination by public entities receiving federal assistance.

152.    Defendants have violated and are continuing to violate the RA by discriminating against plaintiff and the intended residents of Legacy House, *inter alia* by and through disparate treatment, breaching the purchase agreement with plaintiffs in bad faith, violating or circumventing multiple federal and state laws, pretending the refusal to sell the property to

plaintiffs is due to some reason other than the handicap of the intended residents, failing to comply with governing rules, arbitrarily imposing additional procedural requirements, manipulating official minutes, denying plaintiffs due process and right to be heard, allowing prejudice to dictate the outcome of city council actions and inactions, failing to recuse, illegally and erroneously refusing reasonable accommodation, establishing policies which discriminate against recovering individuals, failing to fully comply with public record law, and malfeasance.

WHEREFORE Plaintiffs demand and pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* granting the following relief:

i.     Declaratory relief stating defendants' mutual and respective actions and inactions constitute violations of the Rehabilitation Act;

ii.    Compensatory damages, including lost profits and/or lost business opportunity;

iii.   Reasonable attorney fees; and

iv.    Such other and further relief as the Court deems necessary and appropriate.

## COUNT FOUR
### Violations of 42 U.S.C. § 18116
### Affordable Care Act
### AGAINST ALL DEFENDANTS

153.   Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

154.   The Affordable Care Act provides that "an individual shall not, on the ground prohibited under ... [the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." The Fifth Circuit has explained that "[f]or

disability discrimination claims, the ACA incorporates the substantive analytical framework of the [Rehabilitation Act].

155.   The City of Monroe receives federal assistance such as the Community Development Block Grant and Home Partnership Grant which are each funded by the United States Department of Housing and Urban Development.

156.   Plaintiffs are "aggrieved" and "qualified persons" under the ACA. Claims under the ACA are analyzed under the same analytical frameworks as claims arising under the ADA. Accordingly, that section is set forth herein as if recopied *in extensio*.

157.   Moreover, defendants have denied the intended residents of Legacy House the benefits of federal funding secured by CMS' Section 1115 waiver granted in favor of Louisiana's Medicaid enrollees by virtue of their disability. This is prohibited by the ACA.

WHEREFORE Plaintiffs pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* and request the Court grant the following relief:

i.      Declaratory relief stating defendants' mutual and respective actions and inactions constitute violations of the Affordable Care Act;

ii.     Compensatory damages, including lost profits and/or lost business opportunity;

iii.    Reasonable attorney fees; and

iv.     Such other and further relief as the Court deems necessary and appropriate.

### COUNT FIVE
**Violations of 42 U.S.C. § 1983**
**Deprivation of Rights and Privileges Under Color of State Law**
**AGAINST ALL DEFENDANTS**

158.   Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

159.    Under color of State law, named defendants including the city council, its individually named defendant-constituents, the mayor, the municipal clerk, the City of Monroe, and its employees and agents, illegally denied plaintiffs clearly established rights arising under Fair Housing Act, Americans with Disabilities Act, Rehabilitation Act, Affordable Care Act, and rights guaranteed by the Louisiana State Constitution and Equal Protection and Due Process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

160.    Indeed, the defendant mayor, city council members, and city clerk are officials whose actions and inactions constitute official policy of the City of Monroe which deprived plaintiffs of constitutional rights.

161.    Also, the City's policy and prescribed procedure for applying for and appealing a denial of a request for reasonable accommodation does not apply to individuals recovering from alcohol and substance abuse, *per the City's definitions*. The City was repeatedly warned this was the case and this City policy served as a moving force behind violations of the constitutional rights of plaintiffs and the intended residents of Legacy House.

162.    The discriminatory decisions of defendants also violated plaintiffs' right to procedural and substantive due process guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution by arbitrarily and irrationally interfering with the legally permitted, economically beneficial use of the property by plaintiffs. Plaintiffs have a distinctive and definite investment-backed expectation in their ability to use and enjoy the property and facility in accordance with their rights arising under the U.S. Constitution, federal law, constitution of Louisiana, Louisiana state law, city policy, the city charter, the purchase agreement, and the rules governing the city, city council, city council meetings and the administration of its business.

163.    Discriminatory actions and inactions of defendants also violated plaintiffs' right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution by refusing to introduce a proposed ordinance subject of a lawfully executed purchase agreement. Defendants treated plaintiffs substantively and procedurally differently than other similarly situated applicants for reasonable accommodation, prospective buyers of City property, and beneficiaries of a proposed ordinance that has been seconded for introduction and where a vote on said ordinance is required pending public debate.

164.    For example, other than in this matter, neither the City of Monroe, nor its Director of Administration, has ever executed a purchase agreement to sell real property correctly zoned for the buyer's intended use and for substantially more than its appraised value, then the Monroe City Council failed to introduce the proposed ordinance to sell the property per the terms of the purchase agreement.

165.    Further, the City imposed additional procedural requirements, terms, and conditions of the contracted sale on plaintiffs such as the "community meeting" fabricated by the city council to avoid voting on the already seconded motion to introduce the ordinance.

166.    Other than here, the City has never proposed an ordinance, seconded the motion to introduce the ordinance, then declined to vote on the ordinance it had proposed to introduce.

167.    Such disparate treatment also includes the selective enforcement of constitutional principles, federal law, state law, city policy, rules governing city officials, city council, and city council meetings intended to irrationally, unreasonably, illegally, and arbitrarily discriminate against plaintiffs and the intended residents of plaintiffs' facility.

168.    The illegal and improper actions of defendants are not roughly proportional to the public good sought to be achieved and are grossly disproportionate to any asserted public interest

because they unduly deprive plaintiffs of their federal and constitutional rights far beyond what is reasonable, legal, or necessary. The actions of defendants unreasonably prevent, frustrate, and impede plaintiffs' rights to purchase, develop, use, operate and enjoy the property for their facility in accordance with federal law and the United States Constitution.

169.    Plaintiffs allege defendants' misconduct qualifies as arbitrary, capricious, and so outrageous so as to shock the contemporary conscious and includes, but is not limited to: disparate treatment, breaching the purchase agreement in bad faith, violating or circumventing multiple federal and state laws, pretending the refusal to sell the property to plaintiffs is due to some reason other than the handicap of the intended residents, failing to comply with governing rules, arbitrarily imposing additional procedural requirements on plaintiffs, manipulating official minutes, denying plaintiffs due process and right to be heard, allowing prejudice to dictate the outcome of city council actions and inactions, failing to recuse, illegally and erroneously refusing reasonable accommodation, establishing policies which discriminate against recovering individuals, failing to fully comply with public record law, and malfeasance.

170.    Plaintiffs particularly allege defendants' conduct intended to injure plaintiffs and worsen their legal plight which is in no way justifiable by any legitimate government interest and defendants' misconduct described herein resulted from deliberate indifference of the rights of plaintiff and/or the intended residents of Legacy House.

WHEREFORE Plaintiffs pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* and request the Court grant the following relief:

i.      Declaratory relief stating defendants' mutual and respective actions and inactions constitute violations of 42 U.S.C. § 1983;

ii.     Compensatory damages, including lost profits and/or lost business opportunity;

iii.    Punitive damages;

iv.    Reasonable attorney fees available under 42 U.S.C. § 1988; and

v.    Such other and further relief as the Court deems necessary and appropriate.

**COUNT SIX**
**Tortious Violation of La. R.S. 42:12**
**Louisiana's Open Meetings Law**
**AGAINST THE MAYOR, MUNICIPAL CLERK, AND**
**INDIVIDUAL DEFENDANT-MEMBERS OF THE CITY COUNCIL**

171.    Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

172.    Louisiana's Open Meeting Law, La. R.S. 42:12, *et. seq.*, recognizes, "It is essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy."

173.    Defendants, through their actions and inactions, are liable to plaintiffs under La. C.C. art. 2315 for violating La. R.S. 42:12, *et. seq.,* including without limitation La. R.S. 42:14. For instance, defendants' mutual and respective decisions to gather information; conduct telephone polling; discuss matters, and determine a binding course of action in secret are violations of Louisiana's Sunshine Laws. Such misconduct is compounded by defendants' failure to call an executive session, adhere to the rules relating thereto, or otherwise inform the public of any of the above which also constitute violations of Louisiana's Open Meeting Law.

174.    Notably, plaintiffs' claims are not for enforcement of said statute or for voidance of defendant's action, but instead, for compensatory damages in tort for violations of La. R.S. 42:12 *et. seq*. To the extent plaintiffs' claims are construed as an enforcement or voidance action under La. R.S. 42:12 *et. seq.*, plaintiffs point out they learned of the operative facts giving rise to

these claims by the City's belated response to a public records request furnished to plaintiffs over sixty (60) days after plaintiffs' request for records was made October 31, 2022.

WHEREFORE Plaintiffs pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* and request the Court grant the following relief:

i.   Declaratory relief stating defendants' mutual and respective actions and inactions constitute violations of La. R.S. 42:12 *et. seq.*;

ii.  Compensatory damages, including lost profits and/or lost business opportunity;

iii. Punitive damages;

iv.  Reasonable attorney fees; and

v.   Such other and further relief as the Court deems necessary and appropriate.

**COUNT SEVEN**
**Violations of La. R.S. 14:134**
**Tortious Malfeasance**
**AGAINST THE MAYOR, MUNICIPAL CLERK, AND**
**INDIVIDUAL DEFENDANT-MEMBERS OF THE CITY COUNCIL**

175.  Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

176.  Defendants, through their mutual and respective actions, inactions, silence, and omissions, are liable to plaintiffs in tort under La. C.C. art. 2315 for violations of La. R.S. 14:134, Louisiana's malfeasance statute. Under said statute it is malfeasance for public officers, officials, or employees to refuse to perform their official duties, perform their duties in an unlawful manner; and/or knowingly allow other officers, officials, or employees under their authority to refuse to perform their duties or perform their duties in an unlawful manner.

177.  The mayor of Monroe, individual members of the city council, city clerk, and attending city officials each and all breached their respective and mutual affirmative official

duties to enforce plaintiffs' rights arising under the Constitution of the United States, Louisiana State Constitution, multiple federal laws, multiple state laws, the city charter, and the rules regulating the respective offices of each official, the city council, city council meetings, the administration of its business and the purchase agreement signed by the Director of Administration.

178.    Such duties also include adhering to the letter and spirit of procedural and administrative requirements relative to introducing proposed ordinances to sell real property; the rules regulating the respective offices of each official, the city council, city council meetings; instructing other council members their actions cannot be influenced by bias against persons with disabilities, resisting public pressure to discriminate against the intended handicapped residents of Legacy House, and refraining from treating plaintiffs and the intended residents of their facility any differently than any other signatory of a purchase agreement with the City of Monroe, beneficiary of a proposed ordinance, or applicant for reasonable accommodation.

179.    More particularly, the city clerk violated numerous duties owed to plaintiffs, including without limitation, her duty to record the motion to introduce the ordinance to sell the property had been seconded during the first city council meeting, the names of the councilmembers who moved and seconded that motion, her duties to the council relating to procedure, and her duty to timely and legally respond to public records requests. Additionally, the city council and city clerk breached their duty not to approve altered city council meeting minutes as official minutes.

180.    Lastly, the mayor, as the chief executive officer of the city responsible for ensuring all laws, provisions of the city charter and acts of the city council are faithfully observed and executed; for supervising the administration of all departments; and for the good

faith enforcement of rules governing the city council, administration of city policy, and obligations owed by the city to its citizens including those who are parties to a contract with the City and/or those applying for reasonable accommodation; breached those duties he owed to plaintiffs as the Mayor of Monroe.

WHEREFORE Plaintiffs pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* and request the Court grant the following relief:

i.    Declaratory relief stating defendants' mutual and respective actions and inactions constitute violations of La. R.S. 14:134 for the purposes of La. C.C. art. 2315;

ii.   Compensatory damages, including lost profits and/or business opportunity; and

iii.  Such other and further relief as the Court deems necessary and appropriate.

**COUNT EIGHT**
**Bad Faith Breach of Contract**
**AGAINST ALL DEFENDANTS**

181.    Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

182.    The City of Monroe, acting through the actions, inactions, and silence of the individually named defendants, breached the purchase agreement in bad faith and are liable to plaintiffs *in solido* under La. C.C. art. 1759 and La. C.C. art. 1983 which requires good faith govern all obligations, including the performance of contracts, the law between the parties.

183.    Additionally, as noted above, ambiguity and vagueness in the purchase agreement is construed against the drafter, namely the City of Monroe. See La. C.C. art. 2056.

184.    The City of Monroe breached the purchase agreement in bad faith by discriminating against the intended handicapped residents of Legacy House based on their disability, refusing to require a written opposition to a proposed ordinance, refusing to introduce

an ordinance, refusing to allow debate and vote on a motion to introduce the ordinance under existing rules because such would reveal discriminatory animus against a protected group was a significant factor in the position taken by defendants and those to whom the decision-makers were knowingly responsive.

185.   The City of Monroe breached the purchase agreement in bad faith by refusing to adhere to rules regulating the respective offices of each official, the city council, and city council meetings, and administration of its business, including those regarding contracts to sell municipal property and proposed ordinances to sell that property.

186.   The City further breached the purchase agreement in bad faith by treating plaintiffs differently than other similarly situated parties to a purchase agreement with the City and proposed ordinances to sell that property as alleged above.

187.   The City further breached the purchase agreement in bad faith by secretly colluding to determine a binding administrative course of action that would prevent sale of the property to plaintiffs, while refusing to disclose such position, and the facts related thereto, to plaintiffs in violation of provisions of the purchase agreement.

188.   The City of Monroe further breached the purchase agreement in bad faith by pretending its refusal to sell the property and/or honor its obligations under the purchase agreement is for some reason other than the handicap of the intended residents of that property.

WHEREFORE Plaintiffs pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* and request the Court grant the following relief:

i.      Declaratory relief stating defendants' mutual and respective actions and inactions constitute bad faith breach of contract;

ii.     Compensatory damages, including lost profits and/or business opportunity; and

iii.     Such other and further relief as the Court deems necessary and appropriate.

**COUNT NINE**
**Tortious Violation of La. R.S. 46:2254**
**Nondiscrimination in Real Estate Transactions**
**AGAINST ALL DEFENDANTS**

189.    Plaintiffs reallege the above facts and allegations as if they were fully set forth herein *in extensio*.

190.    Defendants, through their actions, inactions, and silence are liable to plaintiffs for violating La. R.S. 46:2254 which prohibits discrimination in the terms, conditions, or privileges of a real estate transaction or in the furnishing of services in connection therewith on the basis of a disability and which also prohibits the owner of a property from representing to a person that real property is not available for inspection, sale, rental, or lease when in fact it is available.

WHEREFORE Plaintiffs pray for judgment in their favor and against defendants, individually, jointly, severally and *in solido* and request the Court grant the following relief:

i.      Declaratory relief stating defendants' mutual and respective actions and inactions constitute violations of La. R.S. 46:2254 for the purposes of La. C.C. art. 2315;

ii.     Compensatory damages, including lost profits and/or business opportunity; and

iii.    Such other and further relief as the Court deems necessary and appropriate.

**VII.    JURY DEMAND**

191.    Complainants request trial by jury.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Complainants, Cole Sullivan, Joe Montgomery and Jimmie Gaiennie, individually and as owner-members of Legacy Recovery Services, LLC d/b/a/ "Legacy House" PRAY that Defendants be duly cited to appear and Answer the Complaint, and after due proceedings had, there by a judgment against Defendants the City of Monroe; the Mayor of Monroe Friday Ellis; municipal clerk Carolus Riley, the City Council of Monroe; Juanita Woods; Carday Marshall, Sr.; Douglas Harvey; individually, jointly, severally and jointly, and *in solido* for a true sum of compensatory damages, including lost business opportunity and profits, to be determined by the trier of fact; together with costs, including expert witness fees; appropriate punitive damages; and reasonable attorney fees, together with legal interest thereon as provided by law on both stated and federal claims.

Lastly, Complainants pray for all orders and decrees necessary and proper under the premises and for full, general, and equitable relief.

Respectfully Submitted:

_____

S. HUTTON BANKS LBN 37377
1040 North Ninth St.
Monroe, Louisiana 71201
318-388-1655 telephone
318-816-5026 facsimile
hutton@banksshlaw.com
*Attorney for Colburn "Cole"*
*Sullivan; Joe Montgomery; James*
*"Jimmy" Gaiennie, III; and Legacy*
*Recovery Services, LLC*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| LEGACY RECOVERY SERVICES, LLC; COLBURN "COLE" SULLIVAN, JOE MONTGOMERY, and JAMES "JIMMY" GAIENNIE, III<br>Plaintiffs, | CIVIL ACTION NO. |
| | |
| VERSUS | JUDGE |
| | |
| CITY OF MONROE, LOUISIANA; FRIDAY ELLIS, individually and in his official capacity as Mayor of Monroe; MONROE CITY COUNCIL; DOUGLAS HARVEY; JUANITA WOODS; CARDAY MARSHALL, SR.; KEMA DAWSON; individually, and in official capacities as Monroe City Council members; CAROLUS RILEY, individually, and in her official capacity as Monroe City Clerk; and not yet known employee(s), policy maker(s), enforcement officer(s), agents(s) and supervisor(s).<br>Defendants. | MAGISTRATE<br><br>JURY TRIAL DEMANDED |

## VERIFICATION

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified in and for the State of Louisiana, personally came and appeared:

COLBURN SULLIVAN          JOE MONTGOMERY          JAMES GAIENNIE, III

who each after being duly sworn did depose and state on this 25rd day of May, 2023, that the allegations set forth in the foregoing Complaint are true and correct to the best of their respective knowledge, information, and belief and that each Petitioner requests the relief sought therein.

COLBURN SULLIVAN          JOE MONTGOMERY          JAMES GAIENNIE, III