## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| **LEGACY RECOVERY SERVICES L L C ET AL** | **CIV. ACTION NO. 3:23-00697** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **CITY OF MONROE ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6) filed by Defendants City of Monroe, City Council of Monroe, Kema Dawson, Douglas Harvey, Carday Marshall, Juanita Woods, Friday Ellis, and Carolus Riley. [docs. #16-18]. The motions are opposed. [docs. #24-26].

For reasons assigned below, it is recommended that the motions be GRANTED IN PART and DENIED IN PART.

### Background

Plaintiffs Legacy Recovery Service LLC ("Legacy House"), Colburn Sullivan ("Sullivan"), Joe Montgomery ("Montgomery"), and James Gaiennie ("Gaiennie) filed the instant complaint for damages ("the Complaint") on May 25, 2023. Complaint [doc. #1]. The Complaint names the City of Monroe ("the City"), the City Council of Monroe ("the Council"), Councilmembers Kema Dawson ("Dawson"), Douglas Harvey ("Harvey"), Carday Marshall ("Marshall"), Juanita Woods ("Woods") (collectively "the Councilmembers"),[1] Mayor Friday

---

[1] Dawson, Harvey, Marshall, and Woods are four of the five members of the Council.

Ellis ("Ellis"), and City of Monroe Clerk Carolus Riley ("Riley") as defendants. *Id.* Ellis, Riley, and the Councilmembers are sued in both their official and individual capacities. *Id.* Plaintiffs seek damages and declaratory relief arising from alleged violations of the federal Fair Housing Act ("FHA"), Americans with Disabilities Act ("ADA"), Rehabilitation Act ("RA"), Affordable Care Act ("ACA"), U.S. Constitution, Louisiana Constitution, and Louisiana's Open Meetings Law. *Id.* at pp. 28-39. Plaintiffs also assert state law claims for malfeasance, breach of contract, and discrimination in real estate transactions. *Id.* at pp. 39-44. On August 21, 2023, Ellis and Riley, the Council and Councilmembers, and the City filed the instant motions. Ellis and Riley's M/Dismiss [doc. #16]; Council's M/Dismiss [doc. #17]; City's M/Dismiss [doc. #18].

On January 19, 2022, Sullivan, Montgomery, and Gaiennie organized and registered Legacy House to own and operate a low-level, clinically-managed residential treatment facility ("the Facility"). Complaint [doc. #1, pp. 8-9]. The Facility was to house recovering alcoholics who would pay for treatment with Medicaid funds and pledge to remain sober, attend substance abuse counseling, and take other steps towards recovery.[2] *Id.* at p. 9. Sometime after creating the Legacy House entity, Sullivan, Montgomery, and Gaiennie identified a property owned by the City that they deemed a suitable location for the Facility. *Id.* at p. 10. Located at 1400 and 1401 Stubbs Avenue, the two-story, fifty-six-bedroom building ("the Property") is zoned as B-4 Heavy Commercial District, a designation encompassing Plaintiffs' intended use. *Id.* Adjacent to the Property is a church owned and operated by Pastors Daniel and Carolyn Hunt (collectively "the Pastors Hunt"). *Id.* at p. 11.

---

[2] Funding of the Facility with Medicaid funds is made possible by the State of Louisiana's exemption from rules that would otherwise prohibit such a payment structure for short-term residential treatment facilities ("the Section 1115 Waiver"). *See id.* at pp. 6-7.

On an unspecified date, Sullivan offered to purchase the Property from the City. *Id.* On March 3, 2022, the City's Director of Administration accepted Sullivan's offer. *Id.* at p. 12. A written agreement to sell the Property to Sullivan for $1,050,000.00 ("the Contract") was executed. *Id.*; *see also* Contract [doc. #16-3]. The Contract states that "the offer to purchase is contingent upon" the Council's approval of the Property's sale. Complaint [doc. #1, p. 12]; Contract [doc. #16-3, p. 8].

Six months of meetings and document exchanges pursuant to the Contract followed. Complaint [doc. #1, p. 13]. Plaintiffs allege that "[b]y early September," all parties agreed that the sale contemplated in the Contract could go forward. *Id.* On September 8, 2022, the Council posted notice that a proposed ordinance ("the Ordinance") to sell the Property was scheduled for a vote for introduction at their September 13, 2022, meeting ("the September 13 Meeting"). *Id.* at p. 14.

Five days later, at the September 13 Meeting, the Council moved to introduce the Ordinance, and the motion was seconded. *Id.* Instead of putting the Ordinance to a vote, Dawson – Chairperson of the Council – allowed for oral public comment on the subject. *Id.* The Pastors Hunt took this opportunity to speak, saying that they "did not know" Sullivan and asking whether residents of the Facility would be "screened for mental illness" and "'free' to leave the facility." *Id.* They also asked whether residents would be "felons," "killers," or "rapists" that Legacy House would "send . . . back on the streets" after completing their stay at the Facility. *Id.* at pp. 14-15. After public comments concluded, Woods noted that she "know[s] the church" owned by the Pastors Hunt and suggested the Council "pass over" the vote to introduce the Ordinance until after a community meeting could be held. *Id.* at p.16. Harvey observed that "short of anything egregious" he "always" introduces a proposed ordinance prior to receiving

community feedback. *Id.* Nonetheless, the Council voted to defer voting on introduction of the Ordinance until October 25, 2022 ("the October 25 Meeting"). *Id.*

As discussed at the September 13 Meeting, a community meeting was held on September 26, 2022. *Id.* at p. 17. There, the Pastors Hunt distributed literature opposing sale of the Property, and Daniel Hunt argued that Legacy House's proposed use of the Property was akin to "a 'toilet' in his 'kitchen.'" *Id.*

That same day, Plaintiffs submitted a public records request to the City for all written opposition to the Ordinance. *Id.* at p. 18.

On October 21, 2022, Plaintiffs delivered a letter to the City arguing that Louisiana law requires opposition to a proposed ordinance be filed with the municipal clerk, noting that no such opposition had been filed as to the Ordinance, and observing that oral opposition to the Ordinance had thus far "amounted to illegal discrimination against the intended residents of the [Facility]." *Id.* Plaintiffs demanded the City "honor its obligations" under the Contract and notify them immediately if the City became aware of "any fact . . . that would threaten the sale, use, ownership, or occupancy of the property." *Id.* at pp. 18-19. The letter also "requested reasonable accommodation under the Fair Housing Act and [for] the City to advise [Plaintiffs] whether addition[al] information was necessary" prior to acting on the request. *Id.* at p. 19.

Plaintiffs allege that around this time on an unspecified date, Ellis and unnamed Councilmembers held an unreported, private meeting "to determine a binding course of action regarding the [Contract], the reasonable accommodation request, and the [Ordinance]." *Id.* Plaintiffs also allege that unnamed Councilmembers "conducted telephone polling" around this

time. *Id.* On October 25, 2022, prior to the scheduled Council meeting, Dawson texted Carolyn Hunt that her calls to Hunt were being directed to voicemail. *Id.* at p. 20.[3]

At the October 25 Meeting, the Council moved to vote on introduction of the Ordinance, but the motion was not seconded, and the Ordinance "died" without being introduced. *Id.* at pp. 20-21. In an off-the-record conversation immediately after the meeting, Dawson directed questions posed by Plaintiffs to "legal" and told the Pastors Hunt that she would "call [them] later." *Id.* at p. 21.

On October 28, 2022, the City denied Plaintiffs' request for reasonable accommodation. *Id.* at p. 24. Plaintiffs allege that, in the denial, the City indicated that Plaintiffs "did not 'specifically' know on October 21 that the vote the City deferred to October 25 would not take place." *Id.* Plaintiffs further allege that the City argued they should "have known on October 21 of the City's October 25 'practice' of pretending the motion to introduce [the Ordinance] had not already been seconded." *Id.*

Three days later, on October 31, 2022, Plaintiffs submitted another public records request to the City for "information pertinent to their venture," including communications between Councilmembers and records of relevant Council meetings. *Id.* On January 3, 2023, Riley and the City's record custodian produced partially redacted email correspondences and official Council meeting minutes. *Id.* at pp. 24-25. Plaintiffs allege that the minutes of the September 13 Meeting omit both "the fact that the motion to introduce[e the Ordinance] was seconded [and] the names of the council member seconding that motion." *Id.* at p. 25.

Plaintiffs filed the Complaint on May 25, 2023. Therein, they allege that all of the Defendants are liable for violations of the FHA, ADA, RA, ACA, the Fifth and Fourteenth

---

[3] Plaintiffs note that Carolyn Hunt's contact name on Dawson's phone is "First Lady Hunt." *Id.*

Amendments of the U.S. Constitution, and unnamed provisions of the Louisiana Constitution, as well as breach of contract and discrimination in a real estate transaction. *Id.* at pp. 28-39, 42-44. Plaintiffs also allege that Ellis, Riley, and the Councilmembers are liable for tortious violation of Louisiana's Open Meetings and malfeasance laws. *Id.* at pp. 39-42.

On August 21, 2023, the City filed a motion to dismiss, challenging Plaintiffs' claims on various grounds, including lack of constitutional and prudential standing and failure to state a claim. City's M/Dismiss [doc. #18]. The same day, Ellis and Riley filed a joint motion to dismiss, as did the Council and Councilmembers, both of which adopted the City's motion. Ellis and Riley's M/Dismiss [doc. #16]; Council's M/ Dismiss [doc. #17]. Ellis, Riley, and the Councilmembers seek dismissal of official capacity claims brought against them and assert qualified immunity against several of Plaintiffs' claims against them individually. Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 13-20]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 15-22]. The Council argues it lacks the capacity to be sued. Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 14].

Plaintiffs filed their opposition to the motions on September 27, 2023. Opposition to City's M/Dismiss [doc. #24]; Opposition to Council's M/Dismiss [doc. #25]; Opposition to Ellis and Riley's M/Dismiss [doc. #26].[4, 5] The City, Council, and the Councilmembers replied to

---

[4] While Plaintiffs oppose all three motions, their opposition memorandums do not address all the arguments raised in said motions. The undersigned explains the scope of Plaintiffs' various arguments *infra*.

[5] Plaintiffs request a conversion of the instant motions to dismiss into motions for summary judgment. *See* Defendant City of Monroe's Opposition to M/Dismiss [doc. #24, p. 12]. The undersigned does not rely on materials that are unincorporated into the pleadings or the Complaint. Therefore, conversion of the instant motions is not required. *See* FED. R. CIV. P. 12(d) (requiring conversion of a Rule 12(b)(6) motion to one for summary judgment if the court does not exclude "matters outside the pleadings" in analyzing said motion).

Plaintiffs' opposition memoranda on October 27, 2023.  Reply to Opposition to the City's M/Dismiss [doc. #31]; Reply to Opposition to the Council's M/Dismiss [doc. #32].

Briefing is complete.  Accordingly, this matter is ripe.

## Analysis

The undersigned will first set forth the relevant legal standards of review.  *Infra* section I. The analysis then turns to the Council's capacity to be sued.  *Infra* section II.  Next, the status of official capacity claims against Ellis, Riley, and the Councilmembers is reviewed.  *Infra* section III.  The undersigned then analyzes Plaintiffs' claims under the FHA, *infra* section IV, ADA and RA, *infra* section V, and ACA.  *Infra* section VI.  A review of the § 1983 claims follows.  *Infra* section VII.  The undersigned then analyzes the Open Meetings Law, *infra* section VIII, malfeasance, *infra* section IX, breach of contract, *infra* section X, and nondiscrimination in real estate transactions claims.  *Infra* section XI.

## I.    Legal Standard

### a.    *Federal Rule of Civil Procedure 12(b)(1)*

The Federal Rules of Civil Procedure sanction dismissal where the presiding court lacks subject-matter jurisdiction.[6]  FED. R. CIV. P. 12(b)(1).  Such jurisdiction may be found lacking based upon (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.  *Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).  As a Rule 12(b)(1) motion concerns the trial court's jurisdiction, the court is free to weigh relevant evidence and satisfy itself that it has power to hear

---

[6] The federal courts have limited jurisdiction and cannot adjudicate claims absent a statutory conferral of jurisdiction.  *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012).

the case. *Kling*, 60 F.4th at 284 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir. 1977)). If the motion is supported by a factual attack, then the plaintiff bears the burden to prove by a preponderance of the evidence that the court does indeed have subject-matter jurisdiction. *Kling*, 60 F.4th at 284. A Rule 12(b)(1) motion should only be granted if it appears certain that the plaintiff cannot prove any set of facts in support of her claim entitling her to relief. *In re FEMA*, 668 F.3d at 287. When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the jurisdictional attack should be resolved first. *Ramming*, 281 F.3d at 161.

Rule 12(b)(1) is also an appropriate vehicle for challenges based upon constitutional standing.[7] *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011). Constitutional standing – also known as Article III standing – is predicated on three requirements: (a) The plaintiff must have suffered an "injury in fact" that is (i) concrete and particularized and (ii) actual or imminent, not conjectural or hypothetical; (b) there must be a fairly traceable causal connection between the injury and conduct complained of; and (c) it must be likely, as opposed to speculative, that a favorable decision will redress the injury. *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (quoting *Lujan*, 504 U.S. at 560-61).

b.      *Federal Rule of Civil Procedure 12(b)(6)*

The Federal Rules of Civil Procedure also sanction dismissal where the plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

---

[7] Federal court jurisdiction is limited to certain "cases" and "controversies." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 408 (2013). The doctrine of standing is a child of the "essential and unchanging" case-or-controversy requirement of Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim.  *Twombly*, 550 U.S. at 556.  "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim," *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010), but "[t]hreadbare recitals" of those elements "supported by mere conclusory statements" are insufficient to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  Factual pleadings that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility." *Id.* (quoting *Twombly*, 550 U.S. at 557).  All well-pleaded facts are accepted as true and viewed in the light most favorable to the plaintiff.  *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007).  In conducting this analysis, courts must consider the complaint in its entirety, as well as documents incorporated into the complaint by reference and matters of which the court may take judicial notice.  *Jackson v. City of Hearne*, 959 F.3d 194, 204-05 (5th Cir. 2023) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

The standards governing motions to dismiss for failure to state a claim also control analysis of challenges to prudential – also known as statutory – standing.[8]  *Harold H. Huggins Realty*, 634 F.3d at 795 n.2.  Prudential standing prohibits plaintiffs from litigating (1) the legal rights of third parties; (2) "generalized grievances more appropriately addressed in the representative branches" of government; and (3) claims outside the zone of interest protected by

---

[8] Prudential standing is a form of "judicial self-governance" to prevent adjudication of "questions of wide public significance" in the place of more competent governmental institutions or situations where judicial intervention is unnecessary to protect individual rights.  *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

the relevant statute. *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 (5th Cir. 2013).

## II.    The Council's Capacity to be Sued

As an initial matter, the Council argues that it should be dismissed from this case as it lacks the capacity to be sued.[9]  Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 14].

The capacity to sue or be sued is determined by the law of the state in which a federal trial court sits. FED. R. CIV. P. 17(b)(3).  Under Louisiana law, there are two types of persons capable of being sued: (a) natural persons and (b) juridical persons.  *See* LA. CIV. CODE ANN. art. 24.  Natural persons are "human being[s]," while juridical persons are entities "to which the law attributes personality, such as a corporation or partnership." *Id.*  If an entity is neither a natural person nor a juridical person, then the entity lacks the capacity to sue or be sued. *See, e.g.*, *Roy v. Alexandria City Council*, 984 So.2d 191, 194 (La.App. 3d Cir. 2008) (finding entity lacks capacity to be sued if neither natural nor juridical person).  This prohibition is absolute absent a law providing that the entity may otherwise be sued. *Dantzler v. Pope*, No. 08-3777, 2009 WL 959508, at *1 (E.D.La. Apr. 3, 2009).  In applying these principles, both state and federal courts in Louisiana have consistently held that city councils lack the capacity to be sued. *See, e.g.*,

---

[9] Although the Federal Rules of Civil Procedure do not specifically authorize a motion to dismiss for lack of capacity to be sued, federal courts traditionally entertain pre-answer motions not expressly provided for by rule or statute, including motions concerning capacity to sue or be sued. *Clerk v. Lafayette Police Dep't*, No. 18-cv-00058, 2018 WL 3357899, at *1 (W.D.La. Jun. 22, 2018), *report and recommendation adopted*, 2018 WL 3357257 (W.D.La. Jul. 9, 2018).  The Fifth Circuit has implicitly endorsed using Rule 12 as a vehicle for such motions. *See, e.g.*, *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1991) (affirming grant of motion to dismiss for defendant's lack of capacity to be sued); *see also Angers ex rel. Angers v. Lafayette Consol. Gov't*, No. 07-0949, 2007 WL 2908805, at *1-2 (W.D.La. Oct. 3, 2007) (analyzing motion to dismiss based on lack of capacity to be sued under Rule 12(b)(6)).

*Green v. City of Monroe*, No. 3:22-00884, 2023 WL 2773543, at *8 (W.D.La. Mar. 17, 2023) ("[T]he Monroe City Council lacks the capacity to be sued . . . ."); *Roy v. Alexandria City Council*, 984 So.2d 191, 194 (La.App. 3d Cir. 2008) ("[W]e find that the Alexandria City Council cannot sue or be sued.").

The Monroe City Charter states that the Council constitutes "the legislative branch of the [city] government." MONROE CODE ORDINANCES § 1-03.  Indeed, Plaintiffs do not argue that the Council is a distinct juridical person apart from the City with the legal capacity to sue and be sued.  Rather, Plaintiffs argue that the Council has capacity to be sued as an administrative entity committing administrative violations. *See* Opposition to the City M/Dismiss [doc. #25, pp. 13-15].  Plaintiffs predicate this argument on Federal Rule of Civil Procedure 17(a)(1)(B), which indicates "administrator[s]" may "sue in their own name without joining the [real party interest] for whose benefit the action is brought." *See id.* at pp. 13-14.  This is a fundamentally incorrect invocation of Rule 17(a)(1), which allows for representatives (e.g., administrators or agents) of property, instruments, or persons lacking capacity to bring actions in the name of those they  represent. *See, e.g.*, *Royal v. Boykin*, No. 1:16-cv-00176, 2017 WL 3897168, at. *4 (N.D.Miss. Sep. 6, 2017) ("A wrongful death action brought by an administrator on behalf of an estate is proper in federal court pursuant to Rule 17(a)(1)(B) . . . .").  It would be inapposite to cast the relationship between the Council and the City in the representative-represented light contemplated by Rule 17(a)(1).

Plaintiff's invocation of *Blacks United for Lasting Leadership, Inc. v. City of Shreveport*, is also misguided.  71 F.R.D. 623, (W.D.La. 1976); *see* Opposition to the Council's M/Dismiss [doc. #25, p. 14].  Despite Plaintiff's assertions to the contrary, nowhere does the *Blacks United* court invoke Rule 17 to hold that "municipal administrators, including the equivalent of city

councilmembers," are real parties of interest despite being agents of the city.[10]  Plaintiff's

citation to *Marshall v. Weyerhauser* in support of substantially the same proposition is equally

misguided.  456 F.Supp. 474 (D.N.J. 1978).[11]  The Council is the legislative branch of the City

lacks the capacity to be sued on its own.

Accordingly, it is RECOMMENDED that the Council's motion be granted and all claims

against the Council be dismissed with prejudice.

### III.     Official Capacity Claims

Ellis, Riley, and the Councilmembers argue that claims against them in their official

capacities should be dismissed as duplicative of the claims brought against the City.

Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 13-14]; Memorandum

in Support of the Council's M/Dismiss [doc. #17-1, pp. 15-16].

In actions where a defendant-official is sued in both her individual and official capacity,

and a municipality is also sued, "there potentially exists an overlapping cause of action" whereby

"[t]he official-capacity claims and the claims against the governmental entity essentially merge."

*Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 485 (5th Cir. 2000).  Claims

---

[10] The *Blacks United* court mentions Rule 17 when describing a motion to dismiss predicated on the argument that the plaintiffs – "an organization of black citizens of Shreveport" – were neither real parties nor proper class representatives.  71 F.R.D. at 626 n.4.  That same court describes the councilmember-equivalent defendants (the Mayor of Shreveport and members of the city council) as "agents" or "arms" of the city only when quoting the defendants' argument regarding whether they should be sued in an official or individual capacity.  *Id.*  It is manifest that the substance of the motion in *Blacks United* is inapplicable to the instant case and the parties being discussed therein are not analogous to the Council.

[11] In *Marshall*, the U.S. Secretary of Labor sought a search warrant, which the defendant challenged on the grounds that the Secretary was not the real party in interest.  *Id.* at 476-77.  The judge there held that precedential interpretation of controlling statutory law indicated the Secretary was in fact the real party in interest.  *Id.* at 477.  This holding is irrelevant here as no statute is cited as granting the Council the capacity to be sued.

against defendant-officials in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690 n.55 (1978)). Such claims should be treated as a suit against the government entity "[a]s long as [the entity] receives notice and an opportunity to respond." *Graham*, 473 U.S. at 166 (1985).[12]

Plaintiffs have sued Ellis, Riley, and the Councilmembers in both their individual and official capacities. These defendants are all officials of the City, which is also a defendant in the instant action, thus putting it on notice of the official-capacity claims and giving it an opportunity to respond (which, as a matter of fact, it has). It is thus appropriate to dismiss the duplicative official-capacity claims against Ellis, Riley, and the Councilmembers, leaving the City in their place.[13]

Plaintiffs offer two arguments for leaving the official capacity claims untouched. The first is that official capacity claims may proceed alongside municipal liability claims despite substantially similar facts and legal standards underlying both. Opposition to the Council's M/Dismiss [doc. #25, p. 16]. *Barnes v. City of El Paso* from our sister district is cited in support

---

[12] This is relevant in part because "an award of damages against an official in his personal capacity can be executed only against the official's personal assets, [but] a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id.*

[13] Plaintiffs' claims under the FHA, ADA, RA, ACA, § 1983, and for tortious breach of contract and discrimination in real estate transactions are brought against all Defendants. The claims under the Open Meeting Law and for tortious malfeasance and violation of the Louisiana Open Meeting Law are brought only against Ellis, Riley, and the Councilmembers. Plaintiffs describe Ellis as the "chief executive officer" of the City, and Riley and the Councilmembers as agents of the municipality. Complaint [doc. #1, pp. 3-4]. Accordingly, claims against Ellis, Riley, and the Councilmembers in their official capacities are inherently claims against the City even if that entity is not named by the Complaint in connection with said claims.

of this contention.  No. EP-22-CV-161-KC, 2023 WL 4097075 (W.D.Tex. June 12, 2023).  That case, apart from serving only persuasive value in the Western District of Louisiana, is inapplicable to dismissal of official-capacity claims in the instant action.  The *Barnes* court found that individual-capacity supervisory liability claims differed from municipal liability claims.  *Id.* at *16 ("[The plaintiff's] supervisory liability claims do not simply duplicate her [municipal liability] claims.  Though the two sets of claims involve similar facts and similar legal standards, [plaintiff's supervisory liability] claims turn on [an individual defendant's] personal actions, while her [municipal] claims turn on" policies, customs, and the conduct of policymakers.).  The instant issue concerns official-capacity claims that are not predicated upon supervisory liability.  Accordingly, *Barnes* is not instructive in the instant context.

Plaintiffs next argue that there exists a conflict of interest arising from Defendants' counsel representing both the City and the Councilmembers.  Opposition to the Council's M/Dismiss [doc. #25, pp. 15-16].  *Van Ooteghan v. Gray*, cited by Plaintiffs in support of this position, gestures towards the possibility of potentially problematic conflicts of interest in joint representation.  628 F.2d 488 (5th Cir. 1980), *aff'd in part en banc*, 654 F.2d 304 (1981).  In dicta, the Fifth Circuit speculated that the then-recent holding in *Monell* could result in the type of conflict propounded by Plaintiffs.  *Van Ooteghem*, 628 F.2d at 495 n.7.  However, the *Van Ooteghem* court did not make any findings on this issue and posited that "no party could prevail on th[e] issue, given our conclusion that, as a matter of law . . . [the municipality-defendant] must be liable for the actions of [its agent and co-defendant] . . . ."  *Id.*[14]  There is thus no reason

---

[14] The Fifth Circuit did not further expound on the potential for a conflict of interest upon rehearing the case en banc.  654 F.2d 304 (5th Cir. 1981) (en banc).

to find a potential conflict of interest on the part of Defendants' counsel, let alone to leave the official-capacity claims against Ellis, Riley, and the Councilmembers untouched on that basis.

Accordingly, it is RECOMMENDED that the claims against Ellis, Riley, and the Councilmembers in their official capacity be dismissed with prejudice.

## IV.    Plaintiffs' Federal Fair Housing Act Claims

The first claim in the Complaint asserts that Defendants violated Plaintiffs' rights under the FHA by discriminating in the sale of the Property and failing to make a reasonable accommodation in connection with the same.  Complaint [doc. #1, p. 28].  In support of this claim, Plaintiffs allege various discriminatory conduct by Defendants, including refusing to sell the Property "because of the handicap of its intended residents" and "bow[ing] to the discriminatory animus of the community against protected individuals." *Id.* at p. 29.[15] Defendants argue that this claim should be dismissed for lack of Article III standing and failure to state a claim.  Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 20-22]. Ellis, Riley, and the Councilmembers also assert qualified immunity.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 17-19]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 20-21].

---

[15] Plaintiffs further assert that Defendants' discriminatory misconduct includes disparate treatment of Plaintiffs, bad faith breach of contract, refusing sale of the Property under false pretenses, violation or circumvention of federal and state law, failure to comply with governing rules, arbitrary imposition of procedural rules, manipulation of official minutes, denial of Plaintiffs' due process rights, "allowing prejudice to dictate the outcome of city council actions and inactions," failure to recuse, illegal and erroneous refusal of reasonable accommodation, and establishment of discriminatory policies.  *Id.*

a.    *Constitutional Standing to Bring an FHA Claim*

Defendants argue that the FHA claim should be dismissed for lack of Article III standing. Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 13-15].[16]  Constitutional standing requires a plaintiff to establish injury, causation, and redressability. *Lincoln v. Case*, 340 F.3d 283, 289 (5th Cir. 2003).[17]  The FHA prohibits discrimination "in the sale or rental" and "in the terms, conditions, or privileges of sale" of dwellings, as well as conduct that otherwise "make[s] unavailable or den[ies]" purchase of dwellings because of a handicap of the buyer, the person intending to reside in the dwelling after sale, or any person associated with the buyer.  42 U.S.C. § 3604(f).[18]  "Aggrieved persons" are empowered to bring civil actions under the statute.  *Id.* at § 3613(a).[19]  Accordingly, to prove constitutional standing under the FHA, a

---

[16] Standing to bring an FHA claim also requires prudential standing, *see Bank of America Corp. v. City of Miami*, 581 U.S. 189, 196-97 (2017) (applying 'zone of interest' prudential standing analysis to FHA claim); *but see Joiner v. Rosemonts at Mission Trails*, No. 3:19-cv-142, 2019 WL 1410728 (N.D.Tex. Feb. 25, 2019) ("[T]he sole requirement for standing under [the FHA] is the Article III minima of injury in fact." (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)), but Defendants did not move to dismiss on this basis.  Therefore, the undersigned's analysis is limited to constitutional standing.

[17] This argument is properly analyzed under Federal Rule of Civil Procedure 12(b)(1).  *See supra* section I.a.

[18] The Fifth Circuit has held this statutory language proscribes discrimination in two contexts: the sale or rental of a dwelling and otherwise making unavailable or denying a dwelling. *Meadowbriar Home for Child., Inc. v. Gunn*, 81 F.3d 521, 531 (5th Cir. 1996).  The *Meadowbriar* court also held that for a defendant-official's actions to violate the FHA, she must have the authority to make a dwelling unavailable.  *Id.*  "Discrimination" under the statute includes, *inter alia*, "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person" use of a dwelling.  42 U.S.C. § 3604(f)(3)(B).

[19] Aggrieved persons include any person who (1) claims to have been injured by a discriminatory housing practice or (2) believes that such person will be injured by an imminent discriminatory housing practice.  *Id.* at § 3602(i).  If a court finds that a discriminatory practice occurred, the plaintiff may be awarded actual and punitive damages, injunctive relief, fees, and costs.  *Id.* at § 3613(c).

putative plaintiff must establish that they were actually injured by the putative defendant's discriminatory conduct in a manner that can likely be redressed under that statute.

Here, it is sufficiently alleged that Plaintiffs sustained actual injuries including, *inter alia*, expenditure of time and resources, lost profits, and loss of business opportunities. *See* Complaint [doc. #1, pp. 13, 26]. These injuries are reasonably traceable to the alleged discriminatory conduct of Defendants (i.e., allegedly imposing roadblocks to purchase of the Property not mandated by law and denying Plaintiffs' purchase of the Property based upon the handicapped status of the Facility's intended residents). *See id.* at pp. 12-27. Finally, the injuries can be redressed by an award of actual and punitive damages after a favorable outcome. *See id.* at p. 30. These allegations leave the door open for Plaintiffs to prove facts in support of their claim entitling them to relief. Under these circumstances, it would be inappropriate to dismiss Plaintiffs' FHA claim for lack of constitutional standing.

Defendants cite *Berry v. Jefferson Parish* in support of the proposition that it is impossible to show damages under the FHA until an underlying breach of contract action is resolved. 326 F.App'x 748 (5th Cir. 2009); *see also* Memorandum in Support of the City's M/Dismiss [doc. #18-1, p. 14]. Critically, the *Berry* plaintiffs based their claim on 42 U.S.C. § 3604(a) – a section of the FHA not invoked by Plaintiffs here – that specifically requires putative defendants to either refuse to either make a *bona fide* offer or negotiate entirely. *Berry v. Parish of Jefferson*, No. 07-6551, 2008 WL 11439353, at *5 (E.D.La. May 23, 2008). In other words, the law at issue in *Berry* was concerned with contract law in a way that Plaintiff's FHA claim here is not. Furthermore, § 3604(a) is concerned with discrimination based on race, color, religion, sex, familial status, or national origin. This is not the case with § 3604(f), which prohibits discrimination based on handicap. *Berry* is further distinguishable from the instant

17

action as the underlying contract dispute there was being litigated in state court, while here Plaintiffs' breach of contract claim is before this court in concert with the FHA claim. *See Berry*, 326 F.App'x at 750. Finally, Defendants' argument that injuries under the FHA are speculative because there was a long chain of contingent events that had to occur prior to closing on the Property, *see* Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 14-15], does not address the basic allegation underlying Plaintiffs' FHA claim: Defendants' alleged discrimination led to the injuries described above irrespective of the deal's proximity to closing.

Accordingly, it is RECOMMENDED that the motions be denied to the extent they seek dismissal of the FHA claim for lack of constitutional standing.

b.    *Sufficiency of FHA Claim Pleadings*

Even if Plaintiffs have standing, Defendants contend that they have failed to sufficiently plead that any relevant individuals are members of a protected class or that the Property is available to other prospective buyers. Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 19-20]. On that basis, Defendants move for dismissal of the FHA claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

To state a claim under § 3604(f),[20] a plaintiff-buyer must show that (1) the plaintiff-buyer, a current or intended resident, or an associate of the plaintiff-buyer is a member of a protected class (i.e., handicapped); (2) the plaintiff-buyer applied for or is qualified to purchase

---

[20] Plaintiffs cite to 42 U.S.C. § 3604 generally when lodging their FHA claim. Complaint [doc. # 1, p. 28]. However, the undersigned interprets the claim to be under § 3504(f) specifically as the language Plaintiffs invoke in describing the alleged FHA violations are drawn from that section. *Compare, e.g.,* Complaint [doc. #1, p. 28] ("The Fair Housing Act provides that it is illegal to discriminate in the sale or otherwise make unavailable or deny a dwelling to any buyer because of a handicap of a person residing in that dwelling after it is sold.") *with* 42 U.S.C. § 3504(f)(1)(B) (It is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap because of a handicap of a person . . . intending to reside in that dwelling after it is so sold. . . .").

the relevant dwelling; (3) the plaintiff-buyer was rejected; and (4) the housing remains available to other similarly situated potential purchasers after the rejection. *See Petrello v. Prucka*, 484 F.App'x 939, 942 (5th Cir. 2012) (enunciating this standard as the prima facia case for a § 3604(f) claim); *see also* 42 U.S.C. § 3604(f)(1)-(2) (indicating cause of action may arise from discrimination based on handicap of a plaintiff-buyer, putative resident, or associate of the plaintiff-buyer).

Under the FHA, "handicap" means "a physical or mental impairment which substantially limits one or more" of a person's major life activities. 42 U.S.C. § 3602(h). The Fifth Circuit has held that "[p]articipation in a supervised drug rehabilitation program, coupled with non-use, meets the definition of handicapped" under the FHA. *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 804 (5th Cir. 1994), *aff'd sub nom. City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995). The admissions criteria for future residents of a group home may also evidence handicapped status. *See Harmony Haus Westlake, L.L.C. v. Parkstone Prop. Owners Ass'n*, 851 F.App'x 461, 465 (5th Cir. 2021) ("Because future residents must be admitted to, and complete, an in-patient treatment program, they will be considered handicapped under the FHA.").

Defendants argue that Plaintiffs have insufficiently pleaded the first and fourth prongs of the § 3604(f) standard. As to the first prong, Plaintiffs have sufficiently pleaded that intended residents of the Facility are handicapped. The Facility is described as a "clinically managed residential treatment facility" whose residents will be required "to always remain sober." Complaint [doc. #1, pp. 8-9]. This is a near-perfect recitation of the *City of Edmonds* definition of handicapped under the FHA. Furthermore, individuals are required to "complet[e] intensive inpatient treatment for substance abuse" prior to residing at the Property. *Id.* at p. 9. This

criterion neatly echoes the requirement cited by the Fifth Circuit in *Harmony Haus*. As a general matter, the Fifth Circuit has observed that the risk of relapse poses a substantial limitation on an individual's ability to care for themselves; an individual's "ability to care for themselves while living at [a group recovery home] does not eliminate their 'handicapped' status and protection under the FHA." *Harmony Haus*, 851 F.App'x at 464. Thus, Plaintiffs have sufficiently pleaded that intended residents of the Facility are members of a protected class subject to FHA protection.

At the 'Remains Available' prong, Plaintiffs' pleadings fall short. The Complaint fails to make a plausible showing that the Property remains available to other similarly situated potential purchasers. Plaintiffs never explicitly plead that the Property remains available to other purchasers (although there is no need to invoke 'totemic' words to satisfy the pleading standard). Nor do Plaintiffs allege that the City, its agents, or its officers have made the Property available to such purchasers. As Plaintiffs admit, under state law, the decision to sell surplus property must be made by the "governing authority." Opposition to Defendant City's M/Dismiss [doc. # 18, p. 28]; *see also* LA. REV. STAT. § 33:4712(A) ("A municipality may sell . . . any property . . . which is, in the opinion of the governing authority, not needed for public purposes."). Plaintiffs have not pleaded that the governing authority – the Council – has approved sale of the Property. In fact, Plaintiffs have pleaded that the governing authority has *not* approved sale of the Property. *See* Complaint [doc. #1, p. 22] (alleging Defendants "den[ied] the sale of the [P]roperty to" Plaintiffs). Indeed, Plaintiffs admit that the Council never introduced an ordinance allowing the property to be offered for sale. *See* Complaint [doc. #1, p. 21] (alleging the motion to introduce the motion to introduce the Ordinance failed for lack of being seconded).

Thus, Plaintiffs have thus failed to plead sufficient factual matter to state a claim for relief under § 3604(f).

The undersigned has also considered whether Plaintiffs can proceed under § 3604(f)'s prohibition against "refusal to make reasonable accommodations in rules, policies, practices, or services." 42 U.S.C. § 3604(f)(3)(B).[21] Plaintiffs specifically cite this form of discrimination as one instance among many of misconduct supporting their FHA claim. *See* Complaint [doc. #1, p. 29] ("Plaintiffs specifically reiterate that such discriminatory misconduct includes . . . illegally and erroneously refusing a request for reasonable accommodation."). The invocation of a failure to accommodate is relevant as this cause of action has a test distinct from the generalized § 3604(f) test analyzed *supra*.[22]

A plaintiff bringing a failure-to-accommodate claim must demonstrate that (1) the residents of the affected dwelling suffer from a disability, (2) they requested an accommodation from the defendant, (3) the requested accommodation was reasonable, and (4) the requested accommodation was necessary to afford the residents equal opportunity to use and enjoy the dwelling. *Women's Elevate Sober Living L.L.C. v. City of Plano*, No. 22-40637, 2023 WL 8014228, at *2 (5th Cir. Nov. 20, 2023).

---

[21] Defendants mainly argue that Plaintiffs have insufficiently alleged facts to support their ADA and RA failure-to-accommodate claims. However, Defendants briefly invoke the Plaintiffs' failure-to-accommodate claim under the *FHA*. In an abundance of caution, the undersigned has analyzed that claim.

[22] While Defendants do not specifically challenge the sufficiency of the reasonable accommodation claim, Ellis, Riley, and the Councilmembers argue that Plaintiffs have failed to establish any violation under that statute. Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 15-17]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 18-19]. Accordingly, it is appropriate to analyze whether a failure-to-accommodate violation of the FHA has been sufficiently pleaded.

Plaintiffs also fail to sufficiently plead both the third and fourth elements of this test.  The pleadings are devoid of any detail as to what accommodation Plaintiffs requested.  The Complaint contains only the general allegation that Plaintiffs submitted a letter to the City which "requested reasonable accommodation under the [FHA] and concluded by requesting the City to advise whether addition[al] information was necessary prior to the City acting on applicants' request for reasonable accommodation."  Complaint [doc. #1, p. 19]; *see also* October 31 Letter [doc. #24-13].  There are no allegations concerning which "rules, policies, practices, or services" Plaintiffs requested accommodation for, nor what form the proposed accommodation would have taken.  Absent such allegations, it is impossible to establish that the requested accommodation was plausibly reasonable or necessary.  Plaintiffs have thus failed to plead sufficient factual matter to state a failure-to-accommodate claim that is plausible on the face of the Complaint.[23]

Accordingly, it is RECOMMENDED that Defendants' motion be granted to the extent that it seeks to dismiss Plaintiffs' FHA claim.[24]

## V.    Plaintiff's Americans with Disabilities Act and Rehabilitation Act Claims

Plaintiffs next assert claim are under the ADA, 42 U.S.C. § 12132, and the RA, 29 U.S.C. § 794(a).  Complaint [doc. #1, pp. 30-34].  Plaintiffs allege that Defendants violated those laws

---

[23] The undersigned further observes that in the case of Ellis, Riley, or the Councilmembers, there are no allegations that these defendants have the authority to grant a reasonable accommodation. To be liable for a failure-to-accommodate claim, a defendant-official must have authority to grant that requested accommodation.  *Cf. Meadowbriar*, 81 F.3d at 531 (holding that for a defendant-official's actions to violate the FHA, she must have the authority to make a dwelling unavailable).

[24] As Legacy Recovery has failed to state an FHA claim, the undersigned need not reach whether Ellis, Riley, or the Councilmembers are entitled to qualified immunity as to that cause of action. *See* Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 15-17]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 18-19].

by, *inter alia*, imposing procedural barriers against Plaintiffs' purchase of the Property and denying potential residents of the Facility access to treatment. *Id.* Defendants argue that these claims should be dismissed for lack of prudential standing and failure to state a reasonable accommodation claim. Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 16-18, 20-22]. Ellis, Riley, and the Councilmembers further argue that they are not subject to individual liability under either of these statutes. Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 17-18]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 19-20].

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. [25] Section 504 of the RA prohibits exclusion of qualified individuals from participation in, denial of, or subjection to discrimination under any program receiving federal financial assistance. 29 U.S.C. § 794(a). [26] The Fifth Circuit utilizes the same liability standard for both the ADA and the RA. *See, e.g.*, *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010) ("Because this court has equated liability standards under [the RA] and the ADA, we evaluate [claims] under the statutes together."); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287-88 (5th Cir. 2005) (en banc) ("This circuit, as well as

---

[25] Under the ADA, "qualified individual" refers to an individual with a disability who, with or without reasonable modifications to policies or facilities, meets the requirements for the receipt of services or the participation in programs provided by a public entity. *Id.* at § 12131(2).

[26] Under the RA, a qualified individual (referred to as an "individual with a disability" by the statute) is an individual who (a) has a physical or mental impairment resulting in a substantial impediment to employment and (b) can benefit in terms of employment from vocational rehabilitation. *Id.* at § 705(20)(A).

others, has noted that, because the rights and remedies under both [the ADA and RA] are the same, case law interpreting one statute can be applied to the other.").  To state a generalized claim under the two acts, a plaintiff must sufficiently plead that (1) the plaintiff is a qualified individual; (2) he is being excluded from participation in, or denied the benefits of, services, programs, or activities for which the defendant-public entity is responsible or is otherwise being discriminated against by the defendant-public entity; and (3) the discriminatory conduct of the defendant-public entity is by reason of the plaintiff's disability.  *See J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023) (enunciating the above standard as the prima facie ADA and RA case at summary judgment).

a.    *Prudential Standing*

Defendants argue that Plaintiffs lack prudential standing to bring their ADA and RA claims.  Memorandum in Support of the City's M/Dismiss [doc. # 18-1, pp. 9-11].  Plaintiffs counter that Congress has abrogated prudential standing requirements for both acts, allowing standing under the ADA and the RA to the full extent permitted by Article III.  Opposition to the City's M/Dismiss [doc. #24, pp. 15-16].

The Fifth Circuit has not explicitly stated whether the ADA and RA are subject to prudential standing requirements.  Accordingly, the undersigned looks to statutory language and persuasive authority to determine whether to impose prudential requirements on Plaintiffs' ADA and RA claims.  The ADA explicitly makes the remedies, procedures, and rights promulgated by the statute available to "*any person* alleging discrimination . . . in violation of § 12132."  42 U.S.C. § 12133 (emphasis added).  The RA similarly provides "*any person* aggrieved by any act or failure to act by any recipient of assistance . . . under section 794" access to the remedies, procedures, and rights created by the act.  29 U.S.C. § 794a(2) (emphasis added).  Neither law

imposes a requirement that the person alleging discrimination must himself be a qualified individual (i.e., be handicapped).  The use of "any person" without qualification indicates Congressional intent to allow a class of litigants beyond just qualified individuals to bring claims under both acts.

While the Fifth Circuit has not spoken on this issue, other circuits have explicitly held that the ADA and RA are not subject to prudential standing requirements. *See, e.g.*, *Fulton v. Good*, 591 F.3d 37, 42 (2d Cir. 2009) ("Because of the breadth of  [§§ 12133 and 794a(2)], we have held that ADA and [RA] actions are not subject to any of the prudential limitations on standing that apply in other contexts."); *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332-36 (6th Cir. 2002) (holding that the broad language of ADA and RA enforcement provisions evinces congressional intent to define standing under those statutes to the full extent permitted by Article III).  Courts in sister districts within the Fifth Circuit have also adopted this view.  *See, e.g.*, *McCoy v. Texas Dept. of Crim. Just.*, No. C-05-370, 2006 WL 2331055, at *6 (S.D.Tex. Aug. 9, 2006) (adopting *MX Group* holding regarding ADA and RA standing); *Brister v. Fed. Bureau of Prisons*, No. 5:19-CV-00088, 2020 WL 6494200, at *5 n.5 (E.D.Tex. May 11, 2020) (adopting *Fulton* holding regarding ADA and RA standing), *report and recommendation adopted*  2020 WL 44996-8 (E.D.Tex. Aug. 5, 2020).  Relying on the statutory language and agreeing with the persuasive authority, the undersigned finds that Plaintiffs' ADA and RA claims should be dismissed on this basis.

Accordingly, it is RECOMMENDED that the motions be denied to the extent they challenge Plaintiffs' prudential standing to bring their ADA and RA claims.

b.    *Sufficiency of ADA and RA Failure-to-Accommodate Pleadings*

Defendants also assert that Plaintiffs' failure-to-accommodate claims under the ADA and

RA should be dismissed for failure to state a claim.  Memorandum in Support of the City's

M/Dismiss [doc. #18-1, pp. 13-15].

Under the ADA, a plaintiff may assert a claim for failure to make "reasonable

accommodations to the known physical or mental limitations of an otherwise qualified

individual." 42 U.S.C. § 12112(b)(5)(A).[27, 28]  To survive a motion to dismiss, a plaintiff

bringing a failure-to-accommodate claim must sufficiently plead that (a) he is a qualified

individual with a disability; (b) the disability and its consequential limitations were known by the

covered entity; and (c) the entity failed to make reasonable accommodations.  *Sligh*, 2023 WL

8074256, at *7 (citing *Ball*, 792 F.3d at 596 n.9).

Here, there are no pleadings that Plaintiffs are qualified individuals with disabilities.

While there are numerous allegations concerning the disabilities of prospective residents of the

Facility, those speculative individuals are not a party to the instant matter, nor do Plaintiffs claim

to represent them.  It is self-evident that, if Plaintiffs do not have a disability, there is no way for

Defendants to be aware of such a disability; Plaintiffs certainly have not pleaded any such

---

[27] While this particular provision is under Title I of the ADA – which concerns employment – the Fifth Circuit has applied it outside of the employment context.  *See, e.g.*, *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015) (citing employment failure-to-accommodate statute in case with prisoner plaintiff).

[28] As noted *supra*, the Fifth Circuit has endorsed adjudicating ADA and RA claims together. *See, e.g., Sligh v. City of Conroe*, No. 22-40518, 2023 WL 8074256, at *7-8 (5th Cir. Nov. 21, 2023) (applying standards promulgated for ADA claims to both the ADA and RA).  The undersigned thus utilizes caselaw discussing failure-to-accommodate claims under the ADA to analyze the sufficiency of Plaintiffs' claim under both that act and the RA.

awareness.  Absent allegations that Plaintiffs have a disability that Defendants are aware of, Plaintiffs' failure-to-accommodate claims under the ADA or RA cannot proceed.[29]

Accordingly, it is RECOMMENDED that Defendants' motion to dismiss be granted to the extent that it pertains to Plaintiffs' purported ADA and RA failure-to-accommodate claims.[30]

c.     *Individual Liability under the ADA and RA*

Defendants also move to dismiss claims against Ellis, Riley, and the Councilmembers in their individual capacity.[31]  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 17-18]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 19-20].

The Fifth Circuit has held that plaintiffs cannot sue defendants in their individual capacity under the ADA or RA.  *Lollar v. Baker*, 196 F.3d 603, 608-09 (5th Cir. 1999) (holding employee of entity receiving federal assistance could not be held individually liable under RA); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (5th Cir. 1999) (en banc) (endorsing appellate panel's conclusion that defendants "may not be sued in their individual capacities directly under the provisions of Title II [of the ADA].").  Plaintiffs concede this.  Opposition to Defendant Councilmembers' M/Dismiss [doc. #25, p. 20] ("The councilmembers are correct in

---

[29] The undersigned also notes that the Complaint alleges that the reasonable accommodation was specifically sought pursuant to the FHA alone.  *See* Complaint [doc. #1, p. 19] ("Plaintiffs' letter further requested reasonable accommodation under the Fair Housing Act . . . .").

[30] Plaintiffs have predicated their ADA and RA claims on numerous other theories as well.  *See* Complaint [doc. #1, pp. 31-34].  Defendants have not challenged the sufficiency of the pleadings supporting Plaintiffs' ADA and RA claims generally.  Therefore, it would be inappropriate to adjudicate the sufficiency of these pleadings at this procedural juncture.

[31] This argument is ostensibly couched as a predicate for qualified immunity.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 17-18]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 19-20].  Because Ellis, Riley, and Councilmembers cannot be held individually liable under the ADA or RA, *see infra*, there is no need to conduct qualified immunity analysis.

that the ADA and RA does [sic] not impose direct individual liability on the councilmembers.").
That, then, should be the end of things: Ellis, Riley, and Councilmembers cannot be held liable in
their individual capacities under either the ADA or RA.

Nonetheless, Plaintiffs contend that the City is vicariously liable for the alleged
discrimination exhibited by individual councilmembers, so the ADA and RA claims should be
allowed to proceed on that basis. *Id.* While it is true that public entities may be "liable for the
vicarious acts of any of its employees as specifically provided by the ADA," *Delano-Pyle v.
Victoria Cty.*, 302 F.3d 567, 574-75 (5th Cir. 2002), that such liability is against the municipality,
not its employees or agents. Therefore, the individual defendants are entitled to dismissal of the
ADA and RA claims against them.

It is RECOMMENDED that the ADA and RA claims against Ellis, Riley, and
Councilmembers in their individual capacities be dismissed with prejudice.

## VI. Affordable Care Act Claims

Plaintiffs' next assert claims under the ACA that Defendants allegedly discriminated
against "the intended residents" of the Facility by denying them "the benefits of federal funding
secured by" the Section 1115 Waiver. Complaint [doc. #1, pp. 34-35]. Liability under the *ACA*
is further predicated on Defendants' liability under the *ADA.  Id.* Plaintiffs bring this claim
against all Defendants, who seek dismissal on the basis that they are not subject to liability under
the ACA. Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 22-23];
Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 18-19]; Memorandum
in Support of the Council's M/Dismiss [doc. #17-1, pp. 20-21].

The ACA prohibits exclusion of, denial of benefits to, or subjection to discrimination
under "any health program or activity" funded by federal dollars. 42 U.S.C. § 18116(a).

Individuals protected by the RA are also covered by this prohibition.  *Id.*; *see also* 29 U.S.C. § 794; *Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370, 378 (5th Cir. 2021) ("For disability-discrimination claims, the ACA incorporates the substantive analytical framework of the RA.").  To sufficiently plead a claim under § 18116(a), a plaintiff must show that (1) he has a qualified disability; (2) he is being excluded from participation in, denied the benefits of, or otherwise discriminated against by a covered entity; and (3) such discrimination is by reason of his disability.  *See Francois*, 8 F.4th at 378 (enunciating this standard as the prima facie case for an ACA claim at summary judgment).

As "health program or activity" is not defined by the ACA, the statute itself does not state what entities are covered by § 18116; this is to say that the statute itself does not clarify what a "covered entity" is under the pleading standard.  However, related regulations and relevant caselaw provide guidance.  Department of Health and Human Services ("HHS") regulations[32] specify that "'health program or activity' encompasses all of the operations of entities principally engaged in the business of providing healthcare."  45 C.F.R. § 92.3(b) (2022).  The regulation goes on to say that "for an entity not principally engaged in the business of providing healthcare," the ACA's non-discrimination requirements apply to the entity's operations "only to the extent any such operation received Federal assistance" provided by HHS.  *Id.*; *see also id.* at § 92.3(a)(1) (declaring scope of regulation applies to "[a]ny health program or activity, any part of which is receiving Federal financial assistance . . . provided by [HHS].").  In line with these regulations, courts in the Fifth Circuit have interpreted receipt of federal healthcare funding as a prerequisite to liability under the ACA.  *See Joganik v. E. Tex. Med. Ctr.*, No. 6:19-CV-517,

---

[32] The Secretary of HHS has authority to issue regulations to implement 42 U.S.C. § 18116 under subsection (c) of that statute.

2021 WL 6694455, at *11 (E.D.Tex. Dec. 14, 2021) (finding judicially-noticed evidence that defendant accepted Medicaid and Medicare sufficient to show defendant was a healthcare program receiving federal funding), *report and recommendation adopted*, 2022 WL 243886 (E.D.Tex. Jan. 25, 2022); *see also Esparza v. Univ. Med. Ctr. Mgmt. Corp.*, No. 17-4803, 2017 WL 4791185, at *8 n.39 (E.D.La. Oct. 24, 2017) (observing that HHS regulations promulgated to implement § 18116 "follow the provision's clear text and note that an entity covered by [that section] includes '[a]n entity that operates a health program or activity, any part of which receives Federal financial assistance.'" (quoting 45 C.F.R. § 92.4 (2016))).[33]

Plaintiffs argue that "[the Center for Medicare and Medicaid Services' ("CMS") decision granting, and extending, Louisiana's Section 1115 request to waive restrictions on Medicaid funding [to residential substance abuse treatment facilities], such as [the Facility], qualified as [a] 'health program and activity.'" Opposition to the City's M/Dismiss [doc. #24, p. 33]. This assertion can be read one of two ways. To the extent that Louisiana sought a Section 1115 Waiver by CMS, neither the City nor any other Defendants are liable.[34] However, Plaintiffs assert that the Facility is the "covered entity" for purposes of its ACA claim. Even if this is accurate, the Facility's designation as a 'health program and activity' covered by the ACA does not create liability for Defendants. There are no allegations that the Facility or any associated entity has received the federal funding required to subject the program to the ACA's non-

---

[33] At the time of the *Esparza* decision, the definition of "covered entities" § 18116 was under 45 C.F.R. § 92.4. The provision containing this definition was changed to 45 C.F.R. § 92.3 in 2020. *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authoritiy 85 Fed, Reg, 37,160(b)(1)(b) (June 19, 2020).

[34] Indeed, Defendants take the position that none of them are "covered entities" and are thus not subject to liability under the ACA. *See* Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 18-19]; Memorandum in Support of Council's M/Dismiss [doc. #17-1, pp. 20-21]; Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 22-23].

discrimination provision.  Furthermore, at the risk of stating the obvious, Plaintiffs do not allege that the discrimination for which Defendants are putatively liable was committed by the Facility or its agents, nor have Plaintiffs alleged that the Facility is an instrumentality of Defendants that was used to commit the purported discrimination.  Consequently, it would be improper to predicate ACA liability on the Facility's potential status as a covered entity.

Further, Plaintiffs do not explicitly argue that Defendants are covered entities for purposes of the ACA or that Defendants are "principally engaged in the business of providing healthcare."  While there are allegations that the City "receives federal assistance such as the Community Development Block Grant and Home Partnership Grant," these funds are – by the admission of Plaintiffs – provided by the Department of Housing and Urban Development, not HHS.  Complaint [doc. #1, p. 35]; *see also Community Development Block Grant*, DEP'T OF HOUS. AND URBAN DEV., https://www.hudexchange.info/programs/cdbg/ (last visited Jan. 9, 2024); *Home Investment Partnership Program*, DEP'T OF HOUS. AND URBAN DEV., https://www.hud.gov/program_offices/comm_planning/home (last visited Jan 9, 2024).  This admission puts Defendants outside the scope of the relevant regulation.  Plaintiffs have thus failed to sufficiently plead a plausible claim under the ACA.[35]

---

[35] According to Plaintiffs, some courts require plaintiffs to plead a corresponding civil rights claim as a predicate to a claim under § 18116.  Opposition to the City's M/Dismiss [doc. #24, p. 34].  They argue that the Councilmembers are liable under the ACA on the basis of FHA liability, while the City is vicariously liable for the Councilmembers' violations of the ADA and RA.  Opposition to the Council's M/Dismiss [doc. #25, p. 21].  As discussed supra, the FHA claim, as well as the ADA and RA claims against Ellis, Riley, and the Councilmembers, have failed.  Thus, Plaintiff's ACA cannot be predicated upon those causes of action.  While some ADA and RA claims remain against the City, the mere existence of a predicate civil rights claim does not shield an ACA claim from dismissal.  As the ACA claim is insufficiently pleaded, a defect that cannot be cured by the survival of other civil rights claims.

Accordingly, it is RECOMMENDED that Defendants' motion to dismiss be granted to the extent it challenges Plaintiffs' ACA claim.[36]

## VII.     Section 1983 Claims

Plaintiffs also assert claims under 42 U.S.C. § 1983 alleging Defendants violated Plaintiffs' rights arising under the FHA, ADA, RA, ACA, the Louisiana Constitution, and the Equal Protection and Due Process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution.  Complaint [doc. #1, pp. 35-36].  Defendants challenge the claim on several bases, arguing Plaintiffs lack prudential standing to bring the claims, Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 16-18]; the due process claims fail as a matter of law, *id.* at pp. 23-29; Ellis, Riley, and the Councilmembers are not liable for unnamed violations of the Louisiana Constitution, Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 19]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 21];  Ellis, Riley, and the Councilmembers did not engage in the alleged illegal conduct and thus are not liable for it, Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 19-20]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 22]; and the conduct of Ellis, Riley, and the Councilmembers was not unreasonable.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 20]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 22].

Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the

---

[36] Ellis, Riley, and Councilmembers seek qualified immunity against the ACA claim. Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 18-19]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 20-21].  The undersigned need not reach that argument.

party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42

U.S.C. § 1983. The statute does not create any substantive rights; it simply provides a remedy

for the rights designated therein. *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997).

"Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983."

*Id.* (quoting *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989)).

A § 1983 suit may be brought against a party in that party's official or individual

capacity, as well as against a government entity. *Goodman v. Harris Cnty.*, 571 F.3d 388, 395

(5th Cir. 2009) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)). An

individual-capacity suit seeks to impose liability on a "government officer for actions taken

under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358 (1991). A plaintiff

bringing an individual-capacity claim need only show that "the official, acting under color of

state law, caused the [alleged] deprivation of a federal right." *Goodman*, 571 F.3d at 395 (5th

Cir. 2009) (quoting *Graham*, 473 U.S. at 166). An official-capacity suit is generally "another

way of pleading an action against an entity of which an officer is an agent." *Goodman*, 571 F.3d

at 395 (quoting *Monell*, 436 U.S. at 691 n.55). Therefore, an official-capacity suit is treated as a

suit against the real party in interest—the government entity—and not against the official

personally, *Graham*, 473 U.S. at 166, and is referred to as municipal liability or a *Monell* claim.

*Edwards v. City of Balch Springs*, 70 F.4th 302, 307 (5th Cir. 2023). To succeed on a *Monell*

claim, a plaintiff must prove that he was deprived of a federally protected right pursuant to an

official municipal policy promulgated by the municipal policymaker that was the moving force

behind the constitutional violation. *Id.*

a.    *Section 1983 Prudential Standing*

Defendants' preliminary attack against Plaintiffs' § 1983 claims is based on a lack of prudential standing.  Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 16-17].

As discussed *supra* in section I.b, prudential standing prohibits plaintiffs from litigating the legal rights of third parties; generalized grievances better addressed by the representative branches of government; and claims outside the zone of interest protected by the relevant statute.  Insofar as § 1983 itself imposes prudential standing limitations, recourse under the statute is limited to those who have themselves been injured by violation of a federal right.  *See* 42 U.S.C. § 1983 ("Every person who, under color of [law], subjects, or causes to be subjected [anyone in the jurisdiction of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be *liable to the party injured* . . . ." (emphasis added)).  It should be reiterated that the rights at issue in a § 1983 claim arise not under that statute itself, but under a predicate Constitutional or statutory provision.  *Harrington*, 118 F.3d at 365.  For that reason, putative § 1983 plaintiffs must satisfy any prudential standing requirements imposed by the underlying provision that was allegedly violated.  *See, e.g.*, *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Solid Waste Mgmt. Auth.*, 389 F.3d 491 (5th Cir. 2004) (dismissing § 1983 claim alleging violation of the Dormant Commerce Clause in part for lack of standing under that constitutional provision).

Defendants specifically argue that Plaintiffs lack prudential standing because they seek to enforce the rights of third parties.  Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 16-17].  This argument necessarily fails because Plaintiffs explicitly seek to enforce their own rights, not those of third parties.  The controlling pleadings of the Complaint indicate that Defendants "illegally denied *plaintiffs* clearly established rights arising under" the FHA, ADA,

RA, ACA, Louisiana Constitution, and U.S. Constitution.  Complaint [doc. #1, p. 36] (emphasis

added).  In the case of the FHA, ADA, RA, and ACA claims, while Plaintiffs do indeed argue

that third parties were subjected to discrimination, they further argue that this discrimination led

to the deprivation of *Plaintiffs'* rights, not the rights of those third parties.  *Id.* at p. 29

("Defendants [violated] plaintiffs' rights under the [FHA] by refusing to sell the property and

imposing additional procedures . . . on the sale because of the handicap of its intended residents .

. . ."); *id.* at p. 31 ("The defendants have violated and continue to violate the ADA by and

through disparate treatment of plaintiffs . . . ."); *id.* at p. 33 ("Defendants have violated and are

continuing to violate the RA by discriminating against plaintiff[s] and the intended residents of

Legacy House . . . ."); *id.* at p. 34-35 (incorporating allegations concerning ADA and RA claims

into ACA claim pleadings).  Plaintiffs' claims under the Louisiana and federal constitutions are

also supported by allegations that their relevant rights – not a third party's – were violated.  *Id.* at

p. 36 ("Plaintiffs have a distinctive and definite investment-backed expectation in their ability to

use and enjoy the property and facility in accordance with their rights arising under the U.S.

Constitution [and] constitution of Louisiana . . . .").

Accordingly, it is RECOMMENDED that the motions to dismiss be denied to the extent

that they challenge the prudential standing of the § 1983 claims.

b.    *Section 1983 Based on the FHA and ACA*

For the reasons previously stated, Plaintiffs have failed to state claims under the FHA and

ACA.  It is axiomatic that if a plaintiff has failed to make a showing that a statute was violated,

then is impossible to sustain a § 1983 claim predicated on violation of that same law.  Thus,

Plaintiffs cannot support § 1983 claims against Ellis, Riley, the Councilmembers, or the City

based on violations of the FHA or ACA.

Accordingly, it is RECOMMENDED that Defendants' motions be granted to the extent that they seek dismissal of the § 1983 claims predicated on violations of the FHA and ACA.

c.    *Section 1983 Based on the ADA and RA*

For the reasons previously stated, Plaintiffs cannot assert claims against Ellis, Riley, and the Councilmembers individually.  Likewise, the City has successfully challenged Plaintiffs' reasonable accommodation theory of liability under the ADA and RA.  Therefore , Plaintiffs cannot assert § 1983 claims based upon that theory under those statutes.  However, the § 1983 ADA and RA claims against the City remain as Plaintiffs have pleaded other forms of discrimination giving rise to liability under those statutes.  *See* Complaint [doc. #1, pp. 31-34]. As the City has challenged neither the remaining underlying theories of liability nor the § 1983 claims predicated upon them, these claims remain.

It is RECOMMENDED that Ellis, Riley, and the Councilmembers' motions be granted to the extent that they seek to dismiss § 1983 claims predicated on violations of the ADA and RA, and the City's motion be granted to the extent it seeks dismissal of the § 1983 claim based on ADA and RA failure-to-accommodate claims.  It is FURTHER RECOMMENDED that the City's motion otherwise be denied as to the § 1983 claims predicated on the ADA and RA.

d.    *Section 1983 Fifth Amendment Claim*

Plaintiffs allege that "[t]he discriminatory decisions of defendants also violated plaintiffs' right to procedural and substantive due process guaranteed by" the Fifth Amendment.  Complaint [doc. #1, p. 36].  In their opposition to the City's instant motion, Plaintiffs appear to clarify that this claim is predicated on the Takings Clause of the Fifth Amendment.  *See* Opposition to the City's M/Dismiss [doc. #24, p. 37] ("Contracts are property and create vested rights which are subject to the Fifth Amendment takings clause as applied to the states by the Fourteenth

Amendment.").[37, 38]  The City challenges this claim on the basis that Plaintiffs have failed to establish that they ever had a property interest in the Property.  Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 24-26].  Ellis, Riley, and the Councilmembers contest the claim on the basis that Plaintiffs did not specifically plead that the alleged violation occurred through each individual defendant's own actions.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 19-20]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 21-22].

The Fifth Amendment dictates that "private property [shall not] be taken for public use, without just compensation."  U.S. CONST. amend. V.  This clause is made applicable to the States through the Fourteenth Amendment.  *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017).  "Because the Constitution protects rather than creates property interests, the existence of a property interest

---

[37] Curiously, Plaintiffs include a table of contents in this filing that includes the label "Plaintiffs concede they have no valid Fifth Amendment claim."  *Id.* at p. 2.  As the text of the brief contradicts this, the undersigned conducts a full analysis under the assumption that this concession has not been made.

[38] The Takings Clause of the Fifth Amendment is distinct from the Due Process Clause of that same amendment.  As noted, the undersigned interprets Plaintiffs' claims to arise under the Takings Clause.  While the Complaint ostensibly presents the Fifth Amendment claim as arising under the Due Process Clause, the facts alleged do not preclude the claim from arising under the Takings Clause.  *See* Complaint [doc. #1, p. 36] (describing Defendants as violating the Fifth Amendment "by arbitrarily and irrationally interfering with the legally permitted, economically beneficial use of the property by plaintiffs.").  Plaintiffs' embrace of a Takings Clause argument in its opposition to the instant motions tends to indicate that the claim in fact arises under that provision.  *See* Opposition to the City's M/Dismiss [doc. #24, p. 37].  Furthermore, the Supreme Court has endorsed analyzing putative right violations under constitutional provisions that are more narrowly tailored to address the implicated right than the broad sweep of a due process claim.  *Cf. Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.")  Finally, the dispositive inquiry under either the Takings Clause or the Due Process Clause is whether a cognizable property interest exists.  As established *infra*, there is no such property interest, so Plaintiffs' claim fails in any event.

is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

Under Louisiana law, "private things are owned by individuals, other private persons and by the state or its political subdivisions in their capacity as private persons," LA. CIV. CODE art. 453, while "public things are owned by the state or its political subdivisions in their capacity as public persons." *Id.* at art. 450. Thus, private property for the purposes of the Fifth Amendment in the instant case is property defined as a "private thing" under Louisiana law.

The parties appear to argue past each other as to what property the relevant interest accrues in. The City contends it is the Property, Memorandum in Support of the City's M/Dismiss [doc. #18-1, p. 26]; Reply to Opposition to the City's M/Dismiss [doc. #31, p. 8], while Plaintiffs argue that it is the Contract. Opposition to the City's M/Dismiss [doc. #24, p. 37].

Plaintiffs have failed to establish a taking of the Property. It is uncontested that the Property is owned by the City. *See* Complaint [doc. #1, p. 11] ("Sullivan offered to purchase the property from the City of Monroe . . . ."). The City is a political subdivision of the State of Louisiana. *Id.* at p. 3 ("City of Monroe, Louisiana . . . a municipal corporation and political subdivision organized and operated under the laws of the State of Louisiana."). Sale of the Property must be approved by the Council. *Supra* section IV.b. The Council never approved such a sale, so the City retains ownership of the Property.[39] Accordingly, the Property is a

---

[39] The purchase agreement signed by Sullivan and the Director of Administrative of the City is subject to approval by the Council. Contract [doc. #16-3, p. 8] ("If the Monroe City Council does not approve the sale of the [Property] or the Purchase Price, then this agreement shall be null and void and the deposit returned to [Legacy Recovery]."). The Council did not approve the

"public thing" under Louisiana law, incapable of being taken under the Fifth Amendment.  It would thus be improper to find that Legacy Recovery plausibly pleaded that any of the Defendants violated the Fifth Amendment by taking the Property.

Plaintiffs similarly fail to sufficiently plead a taking of the Contract.  Plaintiffs assert that "[t]he Louisiana Supreme Court has recognized even an unrecorded purchase agreement is a compensable property interest."  Opposition to the City's M/Dismiss [doc. #24, p. 37].  This is both a misstatement of the law and an improper application of it.  The authority cited in support of this proposition resolved the question of whether a lessor with an unexecuted lease had a right to intervene in the sale of a private property being purchased by the State.  *See State Dep't of Transp. and Dev. v. Jacob*, 483 So.2d 592, 595 (La. 1986) ("The issue is simply whether the intervenor had property and whether the State has taken it from the intervenor without compensating him.").  The *Jacob* court ultimately endorsed the rule that "a leasehold interest in land is a property right" entitled to compensation.  483 So.2d at 595-96.  This situation does not stand for the proposition that "an unrecorded purchase agreement is a compensable property interest."  Nor are the facts in *Jacob* substantively representative of those in the instant matter.  As established *supra*, the Property is publicly owned, not privately held; the Property is being purchased from a State entity, not by a State entity; and Plaintiffs do not allege that they are lessors of the Property.  Plaintiffs have failed to establish either that they have a compensable property interest in the Contract or that the Contract creates a compensable property interest in the Property itself.

---

sale.  Indeed, Legacy Recovery explicitly pleads that the City has "refus[ed] to sell the [P]roperty."  Complaint [doc. #1, p. 43].

Plaintiffs have thus failed to plausibly plead a violation of the Fifth Amendment.  On that basis, it would be improper to grant them relief under § 1983 for a violation of that same constitutional provision.

Accordingly, it is RECOMMENDED that the motions be granted to the extent that they challenge the § 1983 claims predicated on violations of the Fifth Amendment.[40]

e.    *Section 1983 Fourteenth Amendment Claims*

Plaintiffs allege that "[t]he discriminatory decisions of defendants also violated [their] right to procedural and substantive due process guaranteed by" the Fourteenth Amendment. Complaint [doc. #1, p. 36].  Ellis, Riley, and the Councilmembers contest the claims on the basis that Plaintiffs did not specifically plead that the alleged violations occurred through each individual defendant's own actions.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 19-20]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 21-22].  The City argues that the substantive due process claim fails as Plaintiffs have not established a property interest in the Property, while the procedural due process claim fails as the proper procedure was followed concerning the various motions surrounding disposition of the Property.  Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 26-29].  The undersigned analyzes the substantive due process claim before turning to its procedural counterpart.

i.    Substantive Due Process

The Fourteenth Amendment dictates that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  Violations of

---

[40] Defendants do not challenge Plaintiffs' putative equal protection claim under the Fifth Amendment.  Thus, that claim remains untouched by the instant motions.

due process protected by this amendment may either be substantive or procedural in nature. For a plaintiff to prevail on a substantive due process claim concerning property, a plaintiff must first establish that he held a property right protected by the Fourteenth Amendment. *Da Vinci Inv., Ltd. P'ship v. Parker*, 622 F.App'x 367, 374 (5th Cir. 2015). In addition to traditional property interests (e.g., ownership), a property interest may accrue in a benefit to which the plaintiff has a legitimate entitlement. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Relevant entitlements are created and defined by existing rules or understandings that "stem from an independent source such as state law." *Id.* If a benefit may be granted or denied at the discretion of government officials, it is not an entitlement. *Id.* To determine whether conferral of a benefit is discretionary, courts look for "explicitly mandatory language," such as specific directives that require a particular outcome to follow the presence of specific predicates. *Ridgely v. FEMA*, 512 F.3d 727, 735-36 (5th Cir. 2008). The Fifth Circuit has warned that, because the Supreme Court "has always been reluctant to expand the concept of substantive due process, [courts must] apply the doctrine with the utmost care." *Conroe Creosoting Co. v. Montgomery Cnty.*, 249 F.3d 337, 341 (5th Cir. 2001) (quotations and citations omitted).

As described *supra* section VII.d, Plaintiffs do not have a property interest in the Property via either ownership or status as a lessor. Nor does it have a property interest by way of benefit. Disposition of the Property is a purely discretionary matter; Plaintiffs cite no provision of law explicitly requiring the Property to be sold.[41] As if to underline this point, Plaintiffs explicitly

---

[41] Plaintiffs point to the directive in LA. REV. STAT. §33:4712 requiring public opposition to sale of public property to be in writing as "explicitly mandatory language." Opposition to the City's M/Dismiss [doc. #24, p. 39]. While this language is indeed explicitly mandatory, this fact is irrelevant to the instant analysis as it concerns the **process** by which a public property sale is conducted. What is relevant is whether the **underlying decision** to sell that public property (i.e., the Property) is governed by mandatory language. It is not. *See* LA. REV. STAT. § 33:4712(A)

acknowledged the discretionary nature of the Property's sale in signing the Contract, which makes purchase contingent upon the Council's approval of the transaction. Contract [doc. #16-3, p. 8] ("If the [Council] does not approve the sale of the [Property] or the Purchase Price, then this agreement shall be null and void and the deposit returned to [Plaintiffs]."). Plaintiffs thus have no property interest on which to sustain a § 1983 claim to remedy violation of their substantive due process rights under the Fourteenth Amendment.

Accordingly, it is RECOMMENDED that the motions be granted to the extent that they challenge the § 1983 claims predicated on an alleged violation of Fourteenth Amendment substantive due process rights.

ii.    Procedural Due Process

The Fourteenth Amendment guarantees procedural due process, which "imposes constraints on governmental decisions which deprive individuals of 'liberty'[42] or 'property'

---

("A municipality *may* sell . . . any property . . . which in the opinion of the governing authority [is] not needed for public purposes.") (emphasis added).

[42] In its opposition briefing, Plaintiffs, for the first time, argue that Defendants violated liberty rights protected by the Fourteenth Amendment. Opposition to the City's M/Dismiss [doc. #24, pp. 37-38]. As a threshold matter, there are no pleadings contained in the Complaint that gesture towards such a claim. It would thus be improper to entertain this purported theory of harm. Furthermore, the case law Plaintiffs cite in support of the improperly raised claim is inapplicable to the current fact pattern. While *Board of Regents of State Colleges v. Roth* does indeed counsel that "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential," this directive was specifically given in the context of discharge from state employment. 408 U.S. 564, 573 (1972) (quotation omitted). The Fifth Circuit has explicitly and repeatedly limited the *Roth* court's directive to the employment discharge context. *See, e.g., Rosenstein v. City of Dallas*, 876 F.2d 392, 395 (5th Cir. 1989) ("It is now beyond any doubt that discharge from public employment under circumstances that put the employee's reputation, honor or integrity at stake gives rise to a liberty interest under the Fourteenth Amendment to a procedural opportunity to clear one's name."); *Walsh v. Hodge*, 975 F.3d 475 (5th Cir. 2020) (applying due process liberty interest analysis to discharge of a university professor). Plaintiffs goes so far as to claim that the Ordinance and Contract "were publicly (and illegally) 'discharged,'" a clear misinterpretation of the controlling precedent. *See* Opposition to the City's M/Dismiss [doc. #24, p. 27]. The

interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Procedural due process "is not a technical conception with a fixed content," but rather a flexible requirement that "calls for such procedural protections as the particular situation demands." *Jones v. Louisiana Bd. of Supervisors of Univ. of Louisiana Sys.*, 809 F.3d 231, 236 (5th Cir. 2015) (quotations and citations omitted).  When evaluating whether a plaintiff was denied procedural due process, courts balance three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value of alternative safeguards; and (3) the Government's interest, including the financial and administrative burdens of alternative procedures.  *Walsh*, 975 F.3d at 482.

It is self-evident that the lack of a private interest will obliterate any basis on which to claim procedural due process was lacking: If a party does not hold a right, then that right cannot be violated.  As established *supra*, Legacy Recovery holds no cognizable property interest in the Property or Contract, thus precluding a violation of its procedural due process rights.

Nonetheless, Legacy Recovery puts forth two arguments to assert that it holds a viable claim.  First, Plaintiffs argue that the process by which the Ordinance was introduced implicated their due process rights.  Opposition to the City's M/Dismiss [doc. #24, pp. 42-45].  This argument appears to be predicated on the notion that improper legislative procedures were followed in the introduction of the Ordinance.  *Id.*  However, there are no allegations that Plaintiffs held a property interest – be that a traditional property interest or an interest-by-benefit – in the Ordinance.  Plaintiffs note that they and the public "have an important interest in the

---

undersigned further observes that Plaintiffs couch this argument as supporting a substantive due process claim, but the argument clearly addresses procedural due process concerns.  *See* Opposition to the City's M/Dismiss [doc. #24, p. 28] (describing alleged violation as "[r]efusing to allow plaintiffs a chance to publicly respond").

purchase agreement, in fair and orderly administration of municipal government, and in advancing the mission of Legacy House." *Id.* at p.44. Just because an interest is labeled "important" in pleadings does not make it a property interest capable of vindication under the Fourteenth Amendment. While plaintiffs can point to "mandatory" language concerning legislative procedure, *see id.* at pp. 43-44 (describing rules allegedly binding procedure of the Council), the cited language is irrelevant as the Ordinance cannot be characterized as a benefit. The Council may very well have failed to follow binding procedures during the September 13 and October 25 Meetings, but none of the procedures mandate conduct that implicates any property right conferred to or held by Plaintiffs. Accordingly, Plaintiffs have failed to establish a cognizable claim under the Fourteenth Amendment in relation to procedures associated with the Ordinance.

Plaintiffs' second argument is that they were denied procedural due process in relation to their request for reasonable accommodation under the FHA. Opposition to the City's M/Dismiss [doc. #24, pp. 45-46]. As established *supra* section V.b, the Complaint contains only barebones allegations concerning the request for reasonable accommodation and does not specify with any particularity what "rules, policies, practices, or services" were associated with the request. In the absence of these basic details, it is impossible to establish the existence of Plaintiffs' relevant interest, let alone the nature of that putative interest and thus the due process that was owed. The undersigned also notes that there are no allegations that Ellis, Riley, or the Councilmembers have any authority over the reasonable accommodation process, so in the event a violation associated with those processes is identified, it would be inappropriate to hold them liable on that basis. Plaintiffs have failed to establish a violation of the Fourteenth Amendment in relation to their request for reasonable accommodation.

Accordingly, it is RECOMMENDED that the motions be granted to the extent that they challenge Legacy Recovery's Fourteenth Amendment procedural due process claim.[43]

*f.*      *Section 1983 Louisiana Constitution Claim*

Plaintiffs' final § 1983 claim is predicated on alleged violation of "rights guaranteed by the Louisiana . . . Constitution."  Complaint [doc. #1, p. 36].  Ellis, Riley, and the Councilmembers argue that this claim cannot be sustained as Plaintiffs "do not specify a single constitutional right" which was allegedly violated, nor how or when such violation occurred. Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 19]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 21].  The City only challenges this § 1983 claim with its failed prudential standing argument.  *See supra* section VII.a.

A review of the Complaint confirms that the pleadings are devoid of mentions of the specific provisions of the Louisiana Constitution allegedly violated by Defendants.  Despite this, Plaintiffs insist that Defendants were "fairly notif[ied]" that they faced claims for alleged violations of Louisiana Constitution, Article I, Sections 2, 3, and 12, as well as Article 12, Section 3.  Opposition to the Council's M/Dismiss [doc. #25, p. 22].  It would be improper to endorse this argument as none of the allegations in the Complaint specifically cite these provisions, nor is any of the alleged misconduct described as a violation of any of the rights arising therefrom.  *See* LA. CONST. art. I § 2 (guaranteeing due process of law); LA. CONST. art. I § 3 (guaranteeing individual dignity); LA. CONST. art. I § 12 (guaranteeing non-discrimination in public accommodations); LA. CONST. art. III § 3 (guaranteeing right to direct participation). While Plaintiffs do allege that their due process rights were violated, this is explicitly described

---

[43] Defendants do not challenge Plaintiffs' putative equal protection claim under the Fourteenth Amendment.  Thus, that claim remains untouched by the instant motions.

as a violation of federally guaranteed rights.  *See* Complaint [doc. #1, p. 36] ("The discriminatory decisions of defendants also violated plaintiffs' right to procedural and substantive due process guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution . . . .").  Furthermore, because the specific provisions of the Louisiana Constitution and thus the rights arising from the same are invoked in subsequent briefing, not the Complaint, it would be improper to consider such invocation part of Plaintiffs' pleadings.  *See Jackson*, 959 F.3d at 204-05 (quoting *Tellabs, Inc.*, 551 U.S. at 322) (limiting pleadings to be analyzed at motion to dismiss stage to the contents of the complaint, documents incorporated into the complaint by reference, and matters of which the court may take judicial notice); *Estes v. JP Morgan Chase Bank, Nat. Ass'n*, 613 F.App'x 277, 280 (5th Cir. 2015) (holding district court did not err in declining to consider allegations first raised in opposition to motion to dismiss).  As Legacy Recovery's pleadings are insufficiently particular to give rise to a claim under the Louisiana Constitution, they are also unable to support a § 1983 claim arising from that failed claim.

Accordingly, it is RECOMMENDED that the motions be granted to the extent that they challenge Plaintiffs' claims arising from the Louisiana Constitution.

**VIII.    Louisiana's Open Meetings Law Claims**

Plaintiffs allege that Ellis, Riley, and the Councilmembers are liable in tort for violations of Louisiana's Open Meeting Law.  Complaint [doc. #1, pp. 39-40].  These Defendants counter that the claim is time-barred and otherwise inapplicable to Ellis and Riley.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 20-22]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 23].

Louisiana law generally requires meetings of public bodies to be open to the public. LA. REV. STAT. § 42:14(A). "Public body" is defined under the statute as follows:

> [Any] village, town, and city governing authorities; parish governing authorities; school boards and boards of levee and port commissioners; boards of publicly operated utilities; planning, zoning, and airport commissions; and any other state, parish, municipal, or special district boards, commissions, or authorities, and those of any political subdivision thereof, where such body possesses policy making, advisory, or administrative functions, including any committee or subcommittee of any of these bodies enumerated in this paragraph.

*Id.* at § 42:13(A)(3). While provisions of the Open Meeting Law are construed liberally, *id.* at § 42:12, they do not cover gatherings of members of the public body "at which there is not vote or other action taken, including formal or informal polling of the members." *Id.* at § 42:13(B). Suits to void an action taken in violation of the statute or to impose civil penalties for the same must be instituted within sixty days of the violation. *Id.* at § 42:24, 28.

Defendants generally attack the Open Meeting Law claim as being instituted after the statutorily imposed sixty-day filing window. Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 20]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 23]. Plaintiffs counter that, because they do not seek to enforce the Open Meetings Law, but rather to recover damages in tort under article 2315 of the Louisiana Civil Code[44] for a violation of the statute, they were not bound to file within the statutory period. Opposition to the Council's M/Dismiss [doc. #25, pp. 26-27]; *see also* Complaint [doc. #1, p. 39].[45] Under Louisiana law, if two statutes conflict, then the "statute specifically directed to the matter at issue must prevail as an exception to" the more general statute. *Roberson-King v. La. Workforce*

---

[44] Article 2315 declares that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

[45] In further support of this argument, Plaintiffs point to the Open Meetings Law's directive to construe the statute liberally. Opposition to the Council's M/Dismiss [doc. #25, p. 26].

*Comm'n*, 904 F.3d 377, 380 (5th Cir. 2018) (quoting *Kennedy v. Kennedy*, 699 So.2d 351, 358 (La. 1996)); *see also Black v. St. Tammany Parish Hosp.*, 25 So.3d 711, 717-18 (La. 2009) (endorsing same judicial canon).

The state's legislature has developed a specific statutory scheme – the Open Meetings Law – concerning public access to government meetings.  This includes a private right of action for those denied rights conferred under the law allowing for, *inter alia*, voidance of violative actions, injunctive relief, declaratory judgment, and civil penalties.  LA. REV. STAT. § 42:24-26, 28.  The statute also requires claims seeking to void violative actions or impose civil penalties to be filed within sixty days of the alleged violation.  *Id.* at § 42:24, 28.  Actions seeking other relief under the law are not statutorily subjected to this filing window.  *See id.* at § 42:26.  Conversely, Article 2315 does not specifically target public access to the workings of government, nor does it limit penalties or impose a tight filing deadline on claimants.  The statutory limitation of remedies available under the Open Meetings Law would be all hat and no cattle if plaintiffs could simply invoke article 2315 as an end-run around them.  *Cf. Gluck v. Casino Am., Inc.*, 20 F.Supp.2d 991, 994 (W.D.La. 1998) ("It would serve little purpose for the Louisiana legislature to specifically provide [limited remedies under the state's Age Discrimination in Employment Act] if the plaintiff can merely invoke Article 2315 [to access] the full range of general and compensatory damages available under tort law.").

Furthermore, the remedies in the Open Meeting Law, along with the limits on their invocation, are the relief that the Louisiana legislature has specifically assigned to those injured under the statute.  Following traditional canons of statutory interpretation, the legislature deemed the remedies included in the statute necessary and appropriate, and excluded remedies that were otherwise: *Expressio unius est exclusio alterius*.  For claims solely predicated on alleged

48

violations of the Open Meetings Law, the limited remedies offered by that statute foreclose other remedies offered by article 2315.  Because Plaintiffs have couched their claim as predicated on the Open Meetings Law, they are entitled only to the remedies under that law.  Accordingly, the request for compensatory and punitive damages is improper, and the claim should be dismissed to the extent it seeks to recover such damages.  Because Plaintiffs did not seek to void Defendants' actions or impose civil penalties, the sixty-day filing window does not apply to this claim, and dismissal on that basis would be inappropriate.  Plaintiffs' claim for declaratory relief under the Open Meetings Law remains untouched.

Ellis and Riley further attack the Open Meetings Law claim on the basis that they are not "public bodies" subject to liability under the statute.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 21].  As discussed *supra*, section 42:14(A) is applicable only to meetings of public bodies as defined under section 42:13(A)(3).  Neither Ellis nor Riley meet the definition of a public body, so they are not subject to liability under the statute.  It is therefore appropriate to dismiss the Open Meetings Law claim insofar as it is brought against Ellis and Riley.[46]

Accordingly, it is RECOMMENDED that the motions be granted in part and denied in part and that Legacy Recovery's Open Meetings Law claim be dismissed to the extent that it seeks compensatory and punitive damages and is otherwise brought against Ellis and Riley.

## IX.    Tortious Malfeasance Claims

Plaintiffs allege that Ellis, Riley, and the Councilmembers are liable in tort for violation of Louisiana's criminal malfeasance in office statute.  Complaint [doc. #1, pp. 40-42].

---

[46] The Councilmembers make no argument about whether they are subject to liability under the Open Meetings Law in their individual capacities.  The undersigned thus does not analyze the potential of dismissal on those grounds.

Defendants argue that, because the claim is predicated on a criminal statute, Plaintiffs lack standing to bring it, "tortious" malfeasance is not a claim recognized by Louisiana courts, and the criminal statute itself takes precedence over any putative tort cause-of-action based upon that statute. Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, pp. 22-23]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, p. 24].

Under Louisiana law, public officers and employees may be criminally liable for, *inter alia*, intentionally refusing or failing to perform a required duty, intentionally performing such a duty in an unlawful manner, or knowingly permitting a subordinate to do the same. LA. REV. STAT. § 14:134(a)(1)-(3). Commission of malfeasance may be punished by up to five years imprisonment, a fine of up to five thousand dollars, or both. *Id.* at § 14:134(c).

As a threshold matter, the undersigned could not identify a single case in a Louisiana state court or federal district court recognizing a claim for "tortious malfeasance." *See also* Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p.22] ("Defendants can identify no Louisiana court recognizing a claim for tortious malfeasance."). This is unsurprising as the Louisiana statute prohibiting malfeasance by public officials is a criminal statute and contains no provision for civil remedy. *See* LA. REV. STAT. § 14:134. In cases where it is necessary to determine whether a private remedy is implicit in a statute that does not expressly provide one, courts should consider four factors: (1) Whether the plaintiff is "one of the class for whose especial benefit the statute was enacted"; (2) "whether there is an indication of legislative intent to create or deny such remedy"; (3) "whether such a remedy would be inconsistent with the underlying legislative purpose; and (4) "whether the cause of action is one traditionally relegated to state law." *Wright v. Allstate*, 250 F,App'x 1, 5 (5th Cir. 2007) (quoting *Cort v. Ash*,

422 U.S. 66, 78 (1975)).[47]  While the Fifth Circuit has utilized all four factors in determining the

presence of an implied private right of action, *see, e.g.*, *Casas v. Am. Airlines, Inc.*, 304 F.3d 517

(5th Cir. 2002), the Supreme Court has intimated that the second factor is essentially dispositive.

*See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Statutory intent . . . is determinative.

Without it, a cause of action does not exist and courts may not create one, no matter how

desirable that might be as a policy matter, or how compatible the statute.").  The undersigned

finds the nearly dispositive nature of the second factor particularly persuasive in the context of a

putative implied right to sue under state law, but will conduct analysis of all four factors for

completeness.

Turning to the analysis, first, there is no indication that Plaintiffs are members of a class

for which Louisiana's malfeasance statute was particularly designed to protect.  In fact, it is not

apparent that the law protects *any* particular class, and courts should be "reluctant to imply

causes of action under statutes . . . for the benefit of the public at large."  *Cannon v. Univ. of

Chicago*, 441 U.S. 677, 690 n.13 (1979).  Second, the undersigned finds no indication that the

Louisiana legislature intended to create an implied civil remedy for malfeasance, nor have

Plaintiffs provided any evidence of such intent.  Third, it is not "consistent with the underlying

purposes of the legislative scheme" to infer a civil remedy as the statute is clearly intended to

establish a criminal offense.  Finally, the proposed cause of action – a tort claim – is traditionally

---

[47] The undersigned notes that, as the fourth factor suggests, the *Cort* test is most often used to identify implied rights of action under federal law.  However, courts in our sister districts have utilized the factors to conduct this analysis in the state law context.  *See, e.g.*, *Morales v. City of New Orleans*, No. 21-1992, 2022 WL 2264178, at *6 (E.D.La. June 23, 2022) (analyzing existence of implied right of action under La. Rev. Stat. § 14:73.10 using *Cort* factors).  Absent directives from a higher court, it is prudent to include the fourth factor in analyzing the existence of an implied cause of action under state law.

relegated to state law.  This final factor further emphasizes the propriety of deffering to the Louisiana state legislature's manifest statutory intent.

All four factors weigh against a finding that there is an implied civil cause of action found in Louisiana's malfeasance statute.  Furthermore, while it is true that the Supreme Court of Louisiana has indicated that criminal statutes "may be guidelines for the court in fixing civil liability," *Laird v. Travelers Inc. Co.*, 267 So.2d 714, 717 (La. 1972); *see also* Opposition to the Council's M/Dismiss [doc. #25, p. 27], the guidance offered therein does not concern the creation of a cause of action in tort.  Rather, the *Laird* court was directing courts to use criminal statutes as guides for identifying "the applicable standard of care or duty owed for purposes of another claim," such as a tort claim.  *Daggs v. Ochsner L.S.U. Health Sys. Of N. La.*, 3:20-CV-00440, 2021 WL 865412, at *8 (W.D.La. Feb. 19, 2021), *report and recommendation adopted*, 2021 WL 1893569 (W.D.La. May 11, 2021); *see also Laird*, 267 So.2d at 717 (La. 1972) ("To decide whether the violation of the criminal statute by [defendant] imposes civil liability upon him [we must determine] what was the nature of the duty imposed on him [by the statute].").  As discussed *supra*, the statutory language does not contemplate a specific protected class, nor does it contemplate recourse for individuals putatively harmed by violations of the law.  It would thus be inappropriate to find that the statute creates a specific duty owed by Ellis, Riley, or the Councilmembers to Plaintiffs.  In summation, there is neither an implied civil right of action arising from Louisiana's malfeasance statute, nor is there reason to find that the statute supports an indirect tort claim in the circumstances.

Accordingly, it is RECOMMENDED that Ellis, Riley, and the Councilmembers' motions to dismiss be granted to the extent that they challenge the claim for tortious malfeasance and that the claim be dismissed with prejudice.

X.      **Bad Faith Breach of Contract Claims**

Underlying this dispute is the Contract.  Plaintiffs have brought a claim against all Defendants for bad faith breach of contract in relation to that agreement.  Complaint [doc. #1, pp. 42-44].  Defendants argue that Legacy House, Montgomery, and Gaiennie lack standing to bring the claim as they are not parties to the Contract.  Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 15-16].  Additionally, Ellis, Riley, and the Councilmembers contest their liability for putative breach on the grounds that they are not bound by the Contract, Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 23]; Memorandum in Support of Councilmember's M/Dismiss [doc. #17-1, pp. 24-25], while the City argues the Contract is subject to a suspensive clause whose non-occurrence released the City from any obligation to sell the Property.  Memorandum in Support of the City's M/Dismiss [doc. #18-1, pp. 29-31].

Under Louisiana law, a contract is "an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906.  Parties to a contract are bound to conduct their contractual obligations in good faith and may be liable for breach if they do not conduct themselves in such a manner. *See id.* at art. 1759; *see also id.* at art. 1983.  "[N]o action for breach of contract may lie in the absence of privity of contract between the parties." *Waste Commanders, LLC v. BFI Waste Servs., LLC*, No. 14-938, 2015 WL 1089320, at *2 (W.D.La. Mar. 2, 2015) (quoting *Pearl River Basin Land & Dev. Co., L.L.C. v. State ex rel. Governor's Off. of Homeland Sec. & Emergency Preparedness*, 29 So.3d 589, 592 (La.App. 1st Cir. 2009)).  While contracting parties may stipulate a benefit for a third-party beneficiary with a "stipulation *pour autrui*," such a stipulation is never presumed and "the intent of the contracting parties [to make benefit a third-party] must be made manifestly clear." *J.D.*

*Fields & Co., Inc. v. Nottingham Const. Co., LLC*, 184 So. 3d 713, 716 (La.App. 1st Cir. 2015) (emphasis removed).[48]

a.     Standing

As the question is jurisdictional, the analysis first turns to whether Legacy House, Montgomery, and Gaiennie have constitutional standing to bring a breach of contract claim. Article III standing requires a plaintiff to establish injury, causation, and redressability. *Lincoln*, 340 F.3d at 289.[49]

Here, standing turns on whether Legacy House, Montgomery, and Gaiennie were parties to the Contract and thus subject to injury should breach of the agreement occur. There are no allegations that these plaintiffs are third party beneficiaries of the Contract, nor does the Contract refer to them as such. It would thus be improper to find that Legacy House, Montgomery, or Gaiennie have standing as third party beneficiaries of the Contract.

The Complaint also lacks any allegations sufficient to show that Sullivan acted as an agent of Legacy House when he signed the Contract. Rather, it is alleged that "the Director of Administration of the City of Monroe accepted *Mr. Sullivan's* offer to purchase [the Property]." Complaint [doc. #1, p. 12] (emphasis added). On the pleadings alone, it would be improper to find that Sullivan's signature was on behalf of Legacy House, so it would further be improper to

---

[48] The Louisiana Supreme Court has identified three criteria for determining whether a contract benefits a third party: (1) the stipulation for a third party if manifestly clear; (2) there is certainty as to the benefit provided; and (3) the benefit is not merely incidental to the contract. *Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary*, 939 So.2d 1206, 1212 (La. 2006). The first factor appears to be dispositive. *Id.* ("The most basic requirement of a stipulation *pour autrui* is that the contract manifest a clear intention to benefit the third party; absent such a clear manifestation, a party claiming to be a third party beneficiary cannot meet his burden of proof.").

[49] This argument is properly analyzed under Federal Rule of Civil Procedure 12(b)(1). *See supra* section I.a.

find that the organization, along with Montgomery and Gaiennie, obtained standing through that signature.

However, as Article III standing is analyzed under Rule 12(b)(1), the court may analyze undisputed facts in addition to the complaint and may also resolve disputed facts. *Kling*, 60 F.4th at 284. Drawing on this allowance, Plaintiffs offer several arguments in support of standing. First, they argue that because Sullivan is a manager-member of Legacy House, he authority to transact on that organization's behalf. Opposition to the City's M/Dismiss [doc. #24, p. 22]. The Complaint contains no allegations that Sullivan is a manager-member of Legacy House.[50] The Plaintiffs offer a draft operating agreement for Legacy House that shows, *inter alia*, Sullivan, Gaiennie, and Montgomery were to be "Managing Members," and such members may bind the entity by entering contracts. Operating Agreement [doc. #24-7, pp. 9, 21]. However, this agreement is unexecuted. Under Louisiana law, the operating agreement governing an LLC is not effective until it is signed, *see Bourbon Invs., LLC v. New Orleans Equity LLC*, 207 So.3d 1088, 1093 (La.App. 4th Cir. 2016) ("[T]he operating agreement was never signed and thus never became effective."), so the draft document tends to show that Sullivan is *not* a manager-member of Legacy House.

Plaintiffs attempt to counteract this inconvenient truth by pointing to caselaw they argue shows "there is no requirement for [an operating agreement] to even be signed to assert rights arising thereunder." Opposition to the City's M/Dismiss [doc. #24, p. 23]. The operating agreement in the authority cited bound the plaintiff and defendant in that case, *Norris v. Causey*, No. 14-1598, 2016 WL 311746, at *5 (E.D.La. Jan. 26, 2016), whereas the instrument at issue

---

[50] While it is alleged that Sullivan, along with Montgomery and Gaiennie, "organized" Legacy Recovery LLC, Complaint [doc. #1, p. 3], this barebones allegation does not provide any insight into the legal powers Sullivan has vis-à-vis the entity.

here was to be binding only as to Sullivan, Montgomery, and Gaiennie. [51]  As Defendants were not prospective parties to the putative operating agreement, they were not on notice as to the potential authority of Sullivan to bind Legacy House under that document.  Thus, the pleadings and the evidence – both proffered by Plaintiffs – indicate that Sullivan is not a manager-member of Legacy Recovery LLC, meaning he is not empowered to transact on its behalf.[52]  While it is undisputed that individuals other than Sullivan participated in negotiations with the City concerning purchase of the Property, this does not address or overcome the conclusion drawn from the pleadings and evidence described above: The preponderance of the evidence does not support Plaintiffs' argument.

The Plaintiffs next argue that Legacy House, Montgomery, and Gaiennie have standing as investment-developers because the money expended toward purchasing the Property was lost due to Defendants' misconduct.  Opposition to the City's M/Dismiss [doc. #24, p. 25].  While Defendants may ultimately be found liable to these plaintiffs, it will not be for breach of a contract that they are neither parties to nor beneficiaries of.  Put another way, because Legacy House, Montgomery, and Gaiennie have no rights under the Contract, they cannot recover based on breach of that instrument.

Finally, plaintiffs argue that Legacy House has organizational standing and may recover for conduct that impaired its ability "to function or provide its core services."  *Id.*  Plaintiffs

---

[51] The agreement was also to be signed by Paul Petty, but this individual is not a party to the instant suit, nor does he appear in any relevant allegations.  *See* Operating Agreement [doc. #24-7, pp. 21-22].

[52] The fact that Sullivan was not a manager-member of Legacy House dispatches with Plaintiffs' argument that the former was authorized to purchase the property and hold it in trust for the latter.  *See* Opposition to the City's M/Dismiss [doc. #24, p. 24].  Legacy Recovery also argues that the City "lacks 'standing' to deny [Legacy House, Montgomery, and Gaiennie's] rights arising under the purchase agreement."  *Id.*  Ultimately, this argument turns on which parties are bound by the Contract and so fails on that basis as well.

rightly point out that the Supreme Court has held that organizations may seek relief for injury and "the consequent drain of resources" resulting therefrom, *see id.* at pp. 25-26.  However, the full text of that finding makes clear that a drain on resources alone is not sufficient to establish standing: "Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests . . . ."  *Coleman*, 455 U.S. at 379.  As Legacy House is not in privity of the Contract, it is incapable of suffering a "concrete and demonstrable injury" arising from violations of rights arising therefrom.

In short, the evidence indicates that Plaintiffs cannot prove any set of facts in support of Legacy House, Montgomery, and Gaiennie's standing to bring a breach of contract claim.

Accordingly, it is RECOMMENDED that the motions be granted to the extent they seek dismissal of Legacy House, Montgomery, and Gaienne's breach of contract claims for lack of standing.

*b.*    *Privity*

The undersigned now turns to Ellis, Riley, and the Councilmembers' argument that they are not in privity of contract with Plaintiffs.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 23]; Memorandum in Support of the Council's M/Dismiss [doc. #17-1, pp. 24-25].  The Complaint styles the breach claim as being "against all defendants."  Complaint [doc. #1, p. 42].  However, the allegations concerning the breach solely concern the City.  *See id.* at pp. 42-44 (note that all allegations in paragraphs 182 through 188 only concern the conduct of "the City of Monroe.").  There are no allegations that Ellis, Riley, or the Councilmembers are parties to, or beneficiaries of, the Contract, nor are they signatories to the

instrument. *See generally* Contract [doc. #16-3].[53]  As there are no pleadings that plausibly state Ellis, Riley, or the Councilmembers are either bound by the Contract or participated in its negotiation, it would be improper to maintain a breach of contract claim against them.

Accordingly, it is RECOMMENDED that Defendants' motions be granted to the extent that they seek dismissal of the breach of contract claim against Ellis, Riley, and the Councilmembers.

*c.    Breach*

It is uncontested that the City is bound by the Contract, but it *is* contested what exactly it was bound to do under that instrument.  Plaintiffs' theory of breach is unclear.  In the Complaint, there are allegations that the breach was predicated, in short, on "discriminat[ion] against the handicapped residents of [the Property]" and "refus[al] to adhere to rules regulating the respective offices of each official."  Complaint [doc. #1, pp. 42-43].  This alleged misconduct is not tied to any obligations created by the Contract.  On the face of the Complaint alone, all that can be gleaned is the supposed breach arose from the general failure of the City to consummate the sale of the Property.

The Purchase Agreement indicates that "[i]f the Monroe City Council does not approve the sale of the [Property] or the Purchase Price, then this agreement shall be null and void and the deposit returned to [Sullivan]."  Contract [doc. #16-3, p. 7].  Plaintiffs admit that the Contract "literally reads that states [sic] '*the offer to purchase*' is subject to city council approval." Opposition to the City's M/Dismiss [doc. #24, p. 46] (emphasis in original).  Under Louisiana law, this clause subjects the City's obligation to sell the Property to a suspensive condition.  *See*

---

[53] The Contract has been incorporated by reference into the Complaint and is thus subject to review under this court's Rule 12(b)(6) analysis.

LA. CIV. CODE art. 1767 ("If the obligation may not be enforced until [an] uncertain event

occurs, the condition is suspensive.").  "[W]hen an obligation is subject to a suspensive

condition, the very existence of the obligation depends upon the occurrence of the event

[triggering enforcement]."  *S. States Masonry, Inc. v. J.A. Jones Const. Co.*, 507 So.2d 198, 203

(La. 1987) (quoting *Cahn Elec. Co., Inc. v. Robert E. McKee, Inc.*, 490 So.2d 647, 652 (La.App.

2d Cir. 1986)).  It is uncontested that the Council never approved sale of the Property.  Absent

this approval, the City was never obligated to sell the Property, and it is self-evident that a non-

existent obligation can neither be performed nor give rise to a breach of contract.  It would thus

be inappropriate to find that Legacy Recovery has sufficiently pleaded a breach of contract claim

based on the City's failure to consummate sale of the Property.

 While not apparent from the face of the Complaint, Legacy Recovery proffers another

theory of breach in its opposition memorandum, arguing that various warranties in the Contract

were violated by the City.  *See* Opposition to the City's M/Dismiss [doc. #24, pp. 46-49].  The

Contract includes warranties by the City that, *inter alia*, "there is no pending or threatened

condemnation or similar proceeding affecting the Property"; consummation of the transaction

"does not violate any agreement, contract, or other instrument to which [the City] is bound"; and

the City is not aware of "any legal actions, suits zoning or rezoning actions, or other legal or

administrative proceedings pending or threatened" against the Property.  *Id.* at pp. 46-47; *see

also* Contract [doc. #16-3, p. 4].  The Contract also obliges the City to inform Sullivan

"immediately if any of the [warranties] become untrue or misleading."  Opposition to the City's

M/Dismiss [doc. #24, p. 47]; *see also* Contract [doc. #16-3, p. 5].

 Plaintiffs argue that these warranties were breached when the City "became aware of

certain claims of concerned citizens related to the ownership, operation, use and occupancy of

the [Property]" and did not notify the putative buyer.  Opposition to the City's M/Dismiss [doc. #24, p. 49].  It strains credulity to find it plausible that complaints from private citizens constitute a legally binding encumbrance or threat to alienation of the Property as contemplated by the Contract's warranties.  Plaintiffs further argue that the opposition by citizens represented "claims" that "resulted in the [City] acquiring knowledge of facts related to administrative proceedings which threated the sale of the [Property]."  *Id.*  Again, there is no indication from the allegations that this opposition can plausibly be described as a claim in the legal sense. Additionally, Plaintiffs' reference to "administrative proceedings" appears to refer to the legislative meetings of the Council.  There is no allegation that these legislative proceedings were of the adjudicative nature that the "administrative proceedings" referenced in the Contract are implied to have.[54]  In short, Plaintiffs have failed to sufficiently plead facts that plausibly show the City breached any of the warranties in the Contract.

Accordingly, it is RECOMMENDED that the motions be granted to the extent that they seek dismissal of the breach of contract claim under Rule 12(b)(6).

## XI.    Nondiscrimination in Real Estate Transactions Claims

Plaintiffs' final claim is against all Defendants for discrimination in a real estate transaction in violation of Louisiana's Civil Rights Act for Persons with Disabilities ("CRAPD").  Complaint [doc. #1, p. 44]; *see also* LA. REV. STAT. § 46:2254.  Defendants argue that Plaintiffs have not pleaded a claim as they themselves are not individual victims of

---

[54] The warranty disclaiming the existence of administrative proceedings also disclaims the existence of lawsuits and other legal adjudications.  *See* Contract [doc. #16-3, p. 4].  It is also worth noting that any ambiguities in the Contract need not be resolved against the drafting party (i.e., the City).  *Id.* at p. 8 ("[T]he normal rule of construction that any ambiguities are to be resolved against the drafting party shall not be applicable in the constructions and interpretation of this Agreement.").

discrimination.  Memorandum in Support of the City's M/Dismiss [doc. #18-1, p. 31].  It is further argued that Ellis, Riley, and the Councilmembers are not subject to liability under section 2254 because they do not administer any program covered by the statute.  Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 23]; Memorandum in Support of Councilmembers' M/Dismiss [doc. #17-1, p. 25].

Under CRAPD, discrimination on the basis of disability is prohibited "in any real estate transaction."  LA. REV. STAT. § 46:2254(A).  CRAPD defines "[p]erson with a disability" as "any person who has an impairment which substantially limits one or more life activities."  *Id.* at § 46:2253(12).  The disability must be "unrelated to an otherwise qualified individual's ability to acquire, rent, or maintain property."  *Id.* at § 46:2254(C).

The plain language of CRAPD indicates that for conduct to trigger liability under the law, the alleged discrimination must target an individual who has a disability.  Plaintiffs do not point to – nor has the undersigned identified – any authority to find otherwise.  As there are no allegations that Sullivan, Montgomery, or Gaiennie are disabled as defined by CRAPD, they cannot successfully state a claim under that law.  It should be noted that plaintiffs have styled this claim as a tortious violation of CRAPD, although it is pleaded as an out-and-out violation of the statute.  Despite the Complaint clearly attempting to plead a claim under CRAPD, Plaintiffs' subsequent briefing argues that it is proper to use the statute as a predicate for a tort claim.  *See* Opposition to the City's M/Dismiss [doc. #24, pp. 49-50].  This argument fails on three grounds.  First, it does not comport with the controlling pleadings.  Second, Legacy Recovery does not cite a statute to give rise to a tort cause-of-action.[55]  Third, as discussed *supra*, if two statutes

---

[55] It is true that Plaintiffs request declaratory relief stating Defendants violated section 2254 "for the purposes of [article 2315 of the Louisiana Civil Code]."  Complaint [doc. #1, p. 44].  However, the pleadings explicitly predicate liability on section 2254.  *See id.* ("Defendants,

conflict, then the "statute specifically directed to the matter at issue must prevail as an exception to" the more general statute, *Roberson-King*, 904 F.3d at 380 (quoting *Kennedy*, 699 So.2d at 358), and here CRAPD is a more specific statute than whatever uncited law Plaintiffs purport to rest their tort claim on.

Accordingly, it is RECOMMENDED that the motions be granted to the extent that they seek to dismiss the CRAPD claim.[56]

## Conclusion

For the foregoing reasons,

**IT IS RECOMMENDED** that Defendant's motion to dismiss [doc. #17] be **GRANTED IN PART** and **DENIED IN PART** and that all claims against Defendant City Council of Monroe be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that claims against Defendants Ellis and Riley under the FHA, ADA, RA, ACA, § 1983 pursuant to the FHA, ADA, RA, ACA, Fifth Amendment's Takings Clause, Fourteenth Amendment's Due Process Clause, and the Louisiana State Constitution, as well as claims for breach of contract and tortious malfeasance,

---

through their actions, inactions, and silence are liable to plaintiffs for violating [section 2254] . . . .").

[56] In the event the court disagrees with the above analysis, Ellis, Riley, and the Councilmembers offer another challenge to the CRAPD claim. They argue that they are not subject to liability under section 2254 as they do not "personally administer any program or activity which received financial assistance" and is covered by the statute. Memorandum in Support of Ellis and Riley's M/Dismiss [doc. #16-1, p. 23]; Memorandum in Support of Councilmembers' M/Dismiss [doc. #17-1, p. 25]. This contention misses the mark as Plaintiffs have alleged discrimination under CRAPD's real estate transaction provision, not the provision covering state-funded programs. Complaint [doc. #1, p. 44] ("Defendants . . . are liable to plaintiffs for violating La. R.S. 46:2254 which prohibits discrimination in the terms, conditions, or privileges of a real estate transaction . . . ."). Should the court find that Legacy Recovery has successfully stated a claim under CRAPD, then it should not be dismissed against Ellis, Riley, or the Councilmembers on the basis that they cannot be liable as program administrators.

discrimination in real estate transactions, and violation of the Louisiana Open Meetings Law be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that claims against Defendants Dawson, Harvey, Marshall, and Woods under the FHA, ADA, RA, ACA, § 1983 pursuant to the FHA, ADA, RA, ACA, Fifth Amendment's Takings Clause, Fourteenth Amendment's Due Process Clause, and the Louisiana State Constitution, as well as claims for breach of contract and tortious malfeasance, discrimination in real estate transactions, and violation of the Louisiana Open Meetings Law to the extent that claim seeks compensatory and punitive damages be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that claims against Defendant City of Monroe under the FHA, ADA and RA failure-to-accommodate provisions, ACA, § 1983 pursuant to the FHA, ADA and RA failure-to-accommodate provisions, ACA, Fifth Amendment's Takings Clause, and Fourteenth Amendment's Due Process Clause, as well as claims for breach of contract and discrimination in real estate transactions be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that the motions be **DENIED** to the extent they putatively seek dismissal of Fifth and Fourteenth Amendment equal protection claims.

**IT IS FURTHER RECOMMENDED** that the Councilmembers' motion be **DENIED** to the extent it seeks dismissal of remedies other than compensatory and punitive damages under the Open Meetings Law and individual capacity claims under the Open Meetings Law.

**IT IS FURTHER RECOMMENDED** that the City's motion be **DENIED** to the extent it seeks dismissal of ADA and RA claims predicated on theories of harm other than a failure-to-accommodate, as well as § 1983 claims based on ADA and RA claims not based on a failure to accommodate.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FED. R. CIV. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 1st day of March, 2024.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE